# <u>EXHIBIT H</u>

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   WOODBRIDGE GROUP OF COMPANIES, .  Case No. 17-12560 (KJC)
     LLC, et al.,                .
 5                               .
                                 .  Courtroom No. 5
 6                               .  824 Market Street
                                 .  Wilmington, Delaware 19801
 7                               .
                                 .  Wednesday, October 24, 2018
 8                  Debtors.     .  10:00 A.M.
     . . . . . . . . . . . . . . . . . .
 9

10                       TRANSCRIPT OF HEARING
                  BEFORE HONORABLE KEVIN J. CAREY
11                 UNITED STATES BANKRUPTCY JUDGE

12   APPEARANCES:

13
     For the Debtors:          Edmon Morton, Esquire
14                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                               Rodney Square
15                             1000 North King Street
                               Wilmington, Delaware 19801
16
                               - and -
17
                               Michael Tuchin, Esquire
18                             Whitman Holt, Esquire
                               KLEE TUCHIN BOGDANOFF & STERN
19                             1999 Avenue of the Stars
                               Los Angeles, California 90067
20
     ECRO:                     AL LUGANO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone:  (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
</pre>

```
 1  APPEARANCES (Continued):

 2  For the Committee:        Richard Pachulski, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
 3                            10100 California State Route 2
                              Los Angeles, California 90067
 4
     For La Rochelle           Joseph Sarachek, Esquire
 5  Noteholders:              SARACHEK LAW FIRM
                              62 Harbor Drive
 6                            Stamford, Connecticut 06902

 7  For Unitholders           Jeffrey Sabin, Esquire
     Committee:                VENABLE LLP
 8                            1270 Avenue of the Americas
                              New York, New York 10020
 9
     For Ad Hoc Noteholder     Steven Kortanek, Esquire
10  Group:                    DRINKER BIDDLE & REATH
                              191 North Wacker Street
11                            Chicago, Illinois 60606

12  For U.S. Trustee:         Timothy Fox, Esquire
                              OFFICE OF U.S. TRUSTEE
13                            844 King Street
                              Wilmington, Delaware 19801
14
     For the SEC:              David Baddley, Esquire
15                            U.S. SECURITIES & EXCHANGE
                              COMMISSION
16                            950 East Paces Ferry Road NE
                              Atlanta, Georgia 30326
17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                              PAGE

3

DEBTORS' WITNESS(s)

4

        **SONEET KAPILA**
5
        Cross Examination by Mr. Sarachek        32
6
        Redirect Examination by Mr. Tuchin       39
7

8       **BRADLEY SHARP**

9       Cross Examination by Mr. Sarachek        43

10      Redirect Examination by Mr. Tuchin       50

11      Recross Examination by Mr. Sarachek      54

12
        **EMILY YOUNG**
13
        Cross Examination by Mr. Sarachek        56
14

15

16  #23) Second Interim Fee Applications.

17  #25) Debtors' Motion for Entry of an Order Authorizing the
    Debtors' to File Under Seal Exhibit 1 to the Declaration of
18  Frederick Chin in Support of Confirmation of the First
    Amended Joint Chapter 11 Plan of Liquidation of Woodbridge
19  Group of Companies, LLC and Its Affiliated Debtors [D.I.
    2830, 10/19/18].
20
    RULING:                                      13
21
    #26) First Amended Joint Chapter 11 Plan of Liquidation of
22  Woodbridge Group of Companies, LLC and Its Affiliated Debtors
    [D.I. 2397, 8/22/18].
23
    #27) Debtors' Motion for Approval of Certain Compromises and
24  Settlements, Partial Substantive Consolidation, and Related
    Relief with Respect to the Plan [D.I. 2721, 10/3/18].
25

| EXHIBITS | I.D. | REC'D |
|----------|------|-------|
| Declaration of Bradley Sharp | | 29 |
| Declaration of Frederick Chin | | 29 |
| Declaration of Soneet Kapila (2) | | 30 |

1       (Proceedings commence at 10:01 a.m.)

2       (Call to order of the Court)

3           THE COURT:  Good morning, all.

4       (A Chorus of "Good Morning, Your Honor")

5           MR. MORTON: For the record, Edmon Morton from

6   Young Conaway Stargatt & Taylor on behalf of the debtors.

7           As we get underway, Your Honor, obviously, the

8   main event today is confirmation and we wanted to highlight

9   in addition to my colleagues from Klee Tuchin and Young

10  Conaway, we also have in the courtroom with us today the four

11  declarants that have submitted declarations.

12          We'll introduce those at the appropriate time, but

13  just so that Your Honor is familiar, we have Emily Young from

14  Epiq who submitted the voting declaration; Soneet Kapila who

15  is the SEC's expert that submitted evidence at both hearing

16  the trustee trial and then also in support of confirmation;

17  Bradley Sharp who is the company's CRO and also Fred Chin who

18  is the company's CEO.

19          If I may, turning to the amended agenda that we

20  filed yesterday, Your Honor, thankfully, to the work of your

21  staff, we can flip straight through to item 23.  Everything

22  else has either been consensually adjourned or disposed of by

23  the court.

24          Item 23, Your Honor, the only two outstanding

25  matters.  Ultimately, Your Honor did enter the order on the

1   committee's professionals.  However, items (k) and (l) from

2   the exhibit, attached to the agenda, were the quarterly

3   applications of Conway & MacKenzie and also Dundon.

4          A CNO was filed just this morning.  Counsel gave

5   me orders to hand up, if Your Honor is prepared to entertain

6   them, if you need to simply review the CNO and those

7   applications later, that's acceptable as well.

8          THE COURT:  I'll take the orders, but will address

9   it after the hearing.

10          MR. MORTON:  Thank you, Your Honor.  If I may

11   approach?

12          THE COURT:  You may.  Thank you.

13          MR. MORTON:   Your Honor, the next item on the

14   agenda, Your Honor has entered an order.  Since it was

15   submitted, that is the final fee application of Gibson Dunn &

16   Crutcher who were initially counsel to the debtors.

17          The next item on the agenda was listed as

18   uncontested going forward.  It's item number 25.  And that is

19   the motion to file Mr. Chin's declaration in a redacted form.

20          As Your Honor no doubt is aware from having

21   reviewed both the motion and the declaration in support of

22   this hearing, the declaration itself sets forth an aggregate

23   estimated value for the debtors' real property holdings at

24   $620 million dollars.

25          The schedule provides the support for that number.

1   And, obviously, since the primary activity of the debtors

2   going forward is going to market and sell those properties,

3   we believe that's commercially sensitive information.

4         It was not the subject of an objection until about

5   fifteen minutes ago when Mr. Sarachek's group of dissenting

6   creditors, I believe, he denotes them filed an objection.  It

7   was well past the deadline that Your Honor set, pursuant to

8   the motion to shorten.  And we haven't had a chance even

9   converse with Mr. Sarachek about it.

10        So, certainly, our view, initially, would be that

11  the objection simply be overruled as untimely, you know,

12  given where we are in the hearing.

13        We will, of course, present arguments on the

14  merits if Your Honor chooses to hear it, but our initial

15  inclination would be that he did not comply with the order

16  and it should be disallowed.

17        THE COURT:  But I thought because it was set on

18  shortened notice that the time to object was now?

19        MR. MORTON:  Your Honor's order set yesterday as

20  10:00 a.m. as the time.  And to give Your Honor credit for

21  having done so, this is, obviously, a very sensitive matter.

22  It would have taken time for us to have evaluated and tried

23  to respond.

24        To put it bluntly, we simply don't believe he's

25  entitled to the information.  It hasn't been -- his objection

1  doesn't raise valuation.  It raises allocation of valuation

2  relative to his view of the different types of claims that

3  his clients hold.  But it doesn't raise valuation as a whole.

4  And we believe that it would be inappropriate to see the

5  exhibit and we certainly have concerns, in particular, with

6  him seeing the exhibit.

7            THE COURT:  I'll hear from the objectors.

8            MR. MORTON:  Thank you, Your Honor.

9            MR. SARACHEK:  Good morning, Your Honor, Joe

10  Sarachek for the dissenting creditors.

11            THE COURT:  Good morning.  Would you first address

12  the timeliness of the objection?

13            MR. SARACHEK:  Sure.

14            Your Honor, we thought that the timeliness was --

15  well, we thought we had until ten o'clock this morning,

16  unless I'm mistaken, and we were looking for the order.  We

17  thought it was ten o'clock this morning at the hearing given

18  the shortened --

19            MR. MORTON:  Your Honor, if I may; my apologies.

20            I did misread the date, so I apologize on this.

21            THE COURT:  All right, thank you.

22            MR. SARACHEK:  Your Honor, again, we're prepared -

23  - a lot of paperwork has been filed since Friday.  We're

24  prepared to enter into confidentiality, but we do think it's

25  very relevant particularly since we have an appeal on

1  Owlwood, which is a significant property.  And it does go to

2  the -- you know, to one of our bases for objection, which is

3  that there should be a reserve set aside or some mechanism

4  that, in the event, you know, it's determined that our

5  clients are secured, and we do believe that that property, in

6  particular, is significant that there's a mechanism set aside

7  to pay our clients.

8          THE COURT:  Well then, certainly, you must have

9  your own view of what that property is worth?

10          MR. SARACHEK:  I do.  I think it's relevant to

11  see, you know, especially since it's such a significant

12  amount of the six hundred some odd million dollars.  I think

13  it is relevant to see what Mr. Chin has in there and we'd ask

14  the court let us see it under, you know -- we're prepared to

15  sign confidentiality or tell the court that we'll maintain

16  confidentiality, but it is relevant and that's our position.

17          THE COURT:  All right, does anyone else wish to be

18  heard?

19          MR. TUCHIN:  Good morning, it's a pleasure to be

20  back in Your Honor's court.

21          Michael Tuchin of Klee Tuchin Bogdanoff & Stern.

22          Your Honor, this is the single most confidential

23  document being filed in this case or these cases.  Were this

24  document to leak, it would give every buyer or potential

25  buyer of the debtors' properties the opportunity to know the

1  debtors' internal valuation.  And I think we could be assured

2  that the prices would, therefore, be adjusted accordingly.

3          As a result, we are extremely reluctant to share

4  this information with anyone who does not have an absolute

5  need to know.  And Mr. Sarachek has not demonstrated, in any

6  way, an absolute need to know.

7          Should this court at the end of the hearing order

8  that an escrow be necessary under the plan, then, I suppose,

9  we could address it at that time.  But it seems to us, at

10 this time, having taken no discovery, having no evidence of

11 his own to establish value, having declined the court's

12 invitation extended months ago to take discovery if he felt

13 he needed it, to show up today and say that he needs to know

14 the values of the properties for undisclosed reasons does not

15 justify sharing the most confidential information with him at

16 this time.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Anyone else wish to be heard?

20          MR. PACHULSKI:  Just a moment, Your Honor.

21          Thank you, Your Honor.

22          Richard Pachulski of Pachulski Stang Ziehl & Jones

23 on behalf of the official creditors committee.

24          I echo what Mr. Tuchin said about the sensitivity

25 of the document, Your Honor.  And, in fact, while I've agreed

1  with Mr. Sarachek that we are not at all raising the pro hac

2  today that it's going to be at an omnibus hearing, if I had

3  any idea that this would be an issue, the committee would

4  have instructed me to go forward today with it.

5         But we are where we are.  But I do need to explain

6  and, again, reaffirm what Mr. Tuchin said this is basically

7  telling buyers what they should probably bid for a piece of

8  property.

9         Now, factually, Owlwood is a good example.  If Mr.

10  Sarachek wants an idea of what these properties are worth,

11  most of them have been put up for sale.  Owlwood has been

12  listed, from my understanding, for a $115 million dollars.

13  That's a matter of public record.

14         Now, I still am struggling to understand why Mr.

15  Sarachek wants to see this because here's the reality.

16         Let's assume Owlwood sells and let's assume there

17  has to be a reserve.  Then, we would all come back and say

18  this is what Owlwood sold for.  We don't have the money to

19  reserve right now, and I think it's based on a security

20  interest, so, again, we're not going to put money aside from

21  Stradella for Owlwood even if -- and we'll argue that it's

22  not the case, that the money has to be set aside.

23         So, other than Mr. Sarachek's curiosity, there's

24  no basis of anything that he's raised in his objection to

25  plan confirmation that would require the necessity of his

1   seeing those numbers.  It's not that case.  We're not doing a

2   traditional reorganization where some of the properties will

3   sell to fund an ongoing basis.

4           They're going to be sold and distributed to

5   creditors including Mr. Sarachek's clients.  So, I'm

6   somewhat, to be honest, perplexed as to what he's really

7   trying to achieve in this case when most of these he can

8   either figure out, talk to a broker, or actually look at the

9   listings that have taken place today.

10          THE COURT:  Thank you.

11          MR. PACHULSKI:  Thank you, Your Honor.

12          MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

13  on behalf of the unitholders committee.

14          I echo and concur with the statements made by Mr.

15  Tuchin and Mr. Pachulski.  And, for the record, I would ask

16  you to take judicial notice of the listing that was actually

17  in last Friday's Wall Street Journal, a picture of the

18  property, a $115 million dollars listing price.

19          And if all that he wants is to understand what the

20  debtors' view is right now in the process of seeking to

21  market the property, best evidence you can take judicial

22  notice of.

23          Number two, I would reserve comments about any

24  reserve at all since, as I understand it, the plan, if it is

25  confirmed, would, number one, eliminate any liens that he,

1  otherwise, is asserting, directly or indirectly.

2          And, number two, to my knowledge, there is, while

3  there is an appeal pending, there is no stay pending appeal

4  of your decision on the motion to dismiss his adversary

5  proceeding.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Does anyone else wish to be heard?

9          Mr. Sarachek, I'll give you the last word, if you

10 like it?

11         MR. SARACHEK:  Thank you, Your Honor.  I'm fine.

12         THE COURT:  All right.

13         I'm going to grant the request for relief with

14 respect to filing under seal and overrule the objection.

15 Frankly, two major reasons for it is, one, the dissenting

16 creditors could have either conducted discovery in connection

17 with confirmation and, of course, it's apparently undisputed.

18 I missed it myself but the property was listed for sale at a

19 $115 million dollars in the Wall Street Journal.  And,

20 secondly, I think that it's apparent that it would not work

21 in the debtors' favor but would probably be harmful to the

22 debtor and the creditor body were the prices of the various

23 properties that are contained as attachments to the Chin

24 declaration would be disclosed.

25         So, I will grant that relief.  Do you have a form

1   of order for me?

2           MR. MORTON:  I do, Your Honor.  May I approach?

3           THE COURT:  Yes.  Thank you.

4           That order has been signed.

5           MR. MORTON:  Thank you, Your Honor.

6           Skipping briefly to the end of the agenda, for a

7   moment.  As Mr. Pachulski just noted, item 28 has been

8   adjourned to the November 20 hearing and won't be undertaken

9   today.  That's the motion dealing with Mr. Sarachek's *pro hac*

10  *vice* admission.

11          That leaves us with items 27 and 26, Your Honor.

12  Item 27 is the plan settlement motion that we filed.  You'll

13  note that we filed a certificate of no objection, but did not

14  submit a proposed form of order with it.  And that was on

15  purpose, Your Honor.  It was always intended that the plan

16  settlement motion would be approved as part of and in the

17  confirmation order itself, and that's how it's been treated.

18          THE COURT:  So that any record that would be made

19  today would be made jointly in connection with confirmation

20  and that motion?

21          MR. MORTON:  That is the intent, Your Honor.

22          We should point out that, you know, several days

23  after the objection deadline, a reservation of rights was

24  filed by Mr. Sarachek --

25          THE COURT:  I read it.

1            MR. MORTON:  -- and, so from our perspective,

2   we'll deal with his objection at confirmation and we believe

3   that that's also untimely and also wasn't necessary in

4   opposition to the motion in any event.

5            THE COURT:  I understand.

6            MR. MORTON:  With that, Your Honor, I would cede

7   the podium to Mr. Tuchin to walk us through confirmation.

8            THE COURT:  All right, thank you.

9            MR. TUCHIN:  Thank you, Your Honor.

10           It's a pleasure to be here today seeking

11  confirmation of a plan in these very significant cases.  I

12  cannot think of a case of this magnitude and size where we've

13  had such active creditor participation and support of the

14  plan.

15           As you've seen from the ballot's summary, these

16  plans or this plan for these debtors was overwhelmingly

17  approved in these cases.  And I would note that of the

18  thousand of creditors, we had approximately 85 percent

19  participation in the plan by noteholders and unitholders,

20  which, in my experience, is simply remarkable.

21           As the court probably recalls, in late January

22  following extensive heated litigation, the court entered an

23  order which set the cases on a different course.  A new board

24  was appointed and two additional committees were added to the

25  general unsecured creditors committee:  the official

1  noteholders committee and the official unitholders committee;

2  each fiduciaries representing the interest of the underlying

3  holders.

4        The board met and the board retained Mr. Chin, who

5  is in court, as the debtors' CEO, and Mr. Sharp, who is also

6  in court, as the debtors' CRO.

7        We were welcomed to the case by all involved.  Mr.

8  Sabin, on behalf of the unitholders, immediately flew out to

9  Los Angeles with Ms. Edmonson (ph), another of their

10 colleague, to brief us on the cases, Mr. Klee and me.  We met

11 with Mr. Pachulski, similarly; Mr. Kortanek briefed us by

12 telephone; and we spoke frequently with the SEC as well, as

13 we endeavored to get up to speed on these cases, which was

14 more of a drinking from a firehose than I ever experienced in

15 my career and I think Mr. Klee would say the same.

16        Obviously, there was a massive history already in

17 the cases and a lot going on in the cases.

18        While we were seeking to get up to speed on the

19 legal issues involved, Mr. Chin began work on understanding

20 the properties and working to develop a business plan, which

21 we knew early on was going to be a cornerstone of any

22 consensual resolution of these cases, without an

23 understanding of the properties and what they could yield,

24 and the path to maximizing value, it wasn't going to be

25 possible to resolve the many legal issues.

1                And Mr. Sharp, at the same time, and his team

2      began working on a forensic analysis to understand where the

3      money went, how it flowed, whether the business records

4      reflected reality or not.  They were aided initially by Mr.

5      Kapila report and Mr. Kapila is generously in court today as

6      well.  But they needed to do their own due diligence,

7      obviously.

8                And as Mr. Kapila has indicated and his colleague

9      indicated in testimony before the court in this case, they

10     were hamstrung in their efforts by the lack of cooperation

11     and information.  The debtors, obviously, had much greater

12     access to information for a greater period of time.

13               And so, Mr. Sharp and his team, while they had a

14     good start from Mr. Kapila's report, started from scratch and

15     looked at all the business records themselves, did their own

16     forensic analysis with experts in the area, again, to

17     determine another critical component to cutting the deal.

18     Was this a Ponzi scheme?  Were you able to unscramble the

19     eggs or was substantive consolidation going to be necessary?

20               Through our meetings with the various

21     professionals and weekly calls with financial advisors, the

22     business people, and the attorneys, it became clear to us

23     that there were many complicated and interesting issues in

24     these cases.  Some of which, candidly, we thought could end

25     up in the Supreme Court.

1          There were either splits in the circuit or

2    untested fascinating areas of law, some of which are the

3    subject of the sole remaining objection to confirmation, some

4    of which are not covered by the objection.  But, as I recall,

5    there were about 20, 25 issues that we identified as a result

6    of the initial meetings which could have resulted in years of

7    litigation and tens of millions of dollars of costs.

8          It was also clear to us, and to the other

9    professionals, that there was quite a bit of dissention in

10   the case following what had been extensive litigation.  And

11   without a change in approach, these cases were headed towards

12   years of litigation.

13         We convened all of the attorneys at Klee Tuchin

14   Bogdanoff & Stern to go through the issues and to start

15   framing what the issues were.  We were joined by Young

16   Conaway and counsel for all three committees.  And, in

17   advance, we heard from the SEC through a number of calls and

18   Mr. Baddley, in particular, who's been extraordinary

19   constructive in these cases.

20         The tone we set was that we needed to remember

21   that this was an unusual case with thousands of victims and

22   that one thing was clear.  Every dollar spent on professional

23   fees in the cases was a dollar that would not be available to

24   the victims in these cases.

25         And I would note, and I'm appreciative that we do

1  have a number of the investors in court today and I'm sure

2  their counsel will introduce them at the appropriate time.

3  But they're to be applauded for playing such an active role

4  in these cases.

5          As a result of the view that we had reached and

6  our board's mandate to get these cases resolved as quickly as

7  possible and as economically as possible, not only to reduce

8  the burn, which came directly out of the investors' pockets,

9  but to return money to the investors as quickly as possible.

10  Another very important thing in these cases given that a

11  number of these investors invested significant portions of

12  their life savings and needed not just money but money sooner

13  rather than late.

14          We charged everyone in the case with coming to an

15  amicable resolution.

16          THE COURT:  Let me ask you to pause for a moment

17  as a matter of curiosity.

18          MR. TUCHIN:  Of course.

19          THE COURT:  How many took advantage of the

20  financing program which I approved?

21          MR. TUCHIN:  The financing program did not end up

22  going forward, Your Honor, as I'll let either committee

23  counsel or noteholder counsel describe.

24          THE COURT:  Thank you.

25          MR. TUCHIN:  And by all means, obviously, it's

1  your courtroom.  Feel free to interrupt at any time.

2            THE COURT:  Why I thank you.

3        (Laughter)

4            MR. TUCHIN:  So, Your Honor, I would indicate

5  that, you know, Gibson Dunn & Crutcher, Young Conaway and all

6  of the other parties I mentioned, Mr. Baddley, Mr. Kortanek,

7  Mr. Pachulski, Mr. Sabin all played an extraordinarily

8  helpful role in allowing us to transition into these cases.

9  And all of them demonstrated, candidly notwithstanding, you

10  know, the personal gain that would have accompanied a multi-

11  year case with lots of litigation, they all committed to

12  trying to get these cases resolved quickly, economically so

13  that the most amount of money possible could be returned to

14  the victims.

15            And everyone understood and has appreciated

16  throughout these cases that they are unusual, that we do have

17  victims here, and that we need to try to return as much money

18  as quickly as possible to them.

19            Following our initial retention in the case, we

20  received white papers, which we encouraged, from the

21  committees which set forth their briefing on a number of

22  issues of interest in the case.

23            I mentioned that we sat down in my offices, just

24  attorneys, and went through the issues.  It was like a law

25  school exam day.  Literally, we got out cases.  We read

1  through cases, as people tried to make their points about

2  various cases.  You'll hear about, you know, some of those

3  issues as we address the sole objection that remains.

4          But it was clear, again, that there were not

5  winners and losers.   There was lots of nuance, lots of

6  issues that could have gone either way in trying to resolve

7  some of these issues.

8          In particular, I think of the treatment of the

9  units which was an area where we did get out cases and look

10  through to see if there was any binding precedent in terms of

11  how you would treat different investors in a Ponzi scheme.

12  And lots of great arguments but, ultimately, I think the

13  parties would agree the Supreme Court would have to resolve

14  whether you have a situation in a Ponzi scheme where everyone

15  is treated equally or whether a unit, if it's truly an equity

16  interest, would be treated on a junior basis.

17          I don't know the answer.  And, candidly, the

18  debtors didn't try to reach answers to a lot of these issues

19  because the case law was uncertain and we viewed our role as

20  a mediator trying to bring the parties together, ably

21  represented to try to reach a resolution.

22          We then had the advisors, the financial advisors,

23  meet for a full day at our offices.  And then we had two days

24  of meetings, at which the business people, the financial

25  advisors, and the lawyers for the three committees and the

1  debtors were present in our offices.

2        These were highly contentious meetings, much like

3  in mediation.  We had everyone together.  We broke people

4  apart.  We went room to room trying to compromise.  And

5  following two days of very intense good faith negotiations,

6  we reached agreement on the term sheet for a plan which we

7  promptly filed with the court.

8        And, again, there are three main components to

9  reaching that agreement. One was the work that Mr. Sharp did

10  to be able to present the committees with information

11  regarding what accounting and forensic analysis was

12  available.  And, number two, Mr. Chin's draft business plan

13  which presented alternatives for maximizing the value of the

14  assets.  And then a whole host of legal issues that had to be

15  resolved, one way or another in order, to avoid significant

16  litigation.

17        And those were all built into the term sheet

18  which, ultimately, formed the basis of the plan and the

19  disclosure statement.

20        We then worked with the three committees and the

21  SEC to prepare a plan or reorganization or plan of

22  liquidation and the disclosure statement which were, as you

23  know, filed with the court.  And this court approved the

24  disclosure statement.

25        Following the solicitation efforts commencing, we

1  received a number of inquiries as did the three committees

2  from investors who were confused about what we were trying to

3  accomplish in these cases.  And, in part, that confusion

4  arose because of unauthorized communications from a number of

5  different people to the holders recommending certain courses

6  of action, one versus the other.

7       And, again, by some people who were not before,

8  had never, to my knowledge, been before the court;

9  nonetheless, recommending that they do certain things or not

10  do certain things which, I think, had the effect of confusing

11  a number of holders.

12       And so, we held, in concert with the three

13  committees, five conference calls available for all investors

14  in the company.  We did two call dedicated to unitholders,

15  three calls dedicated to noteholders, and all of the

16  professionals, again, all of the attorneys and Mr. Sharp

17  participated in those calls.

18       And we explained to people the process that we had

19  gone through to reach the agreement, why we thought the

20  agreement was appropriate, and what they were being asked to

21  do.  Almost entirely information that was in the disclosure

22  statement, but understandably most people are not able to

23  make their way through a lengthy disclosure statement and

24  understand all of the nuances, and there was confusion, as I

25  indicated, when they were being approached by other people.

1          We had unbelievable participation, by our count;

2   over a third of the investors participated in these phone

3   calls.  And we received, as did the committees, very, very

4   positive feedback following the calls for having had these

5   calls.

6          And we believe that they resulted in the

7   overwhelming support that we received for the plan.  As I

8   indicated, approximately 85 percent of investors voted on the

9   plan which is a huge number in cases like this.  And of those

10  who voted, as the court saw, 95 percent approximately of the

11  noteholders and unitholders voted in favor of the plan and 97

12  percent, all but one creditor holding general unsecured

13  claims, voted in favor of the plan.

14         The objections to the plan were three.  Two of

15  them had been resolved.  The objection by Contrarian and the

16  objection by the IRS.  Both have confirmed that the changes

17  made to the confirmation order addressed their objections.

18         We also had three objections regarding cure

19  claims.  With respect to the assignment of contracts, all of

20  those have been addressed as well.  I noticed one formally

21  withdrew the objection on the docket yesterday.  But all

22  three have been resolved.

23         That leaves us, as we sit here today, with only

24  one objection to confirmation.  That being from Mr.

25  Sarachek's group.  In addition, the U.S. Trustee had raised

1  an informal concern that we not seek to avoid our burden of

2  proof in confirming the plan.

3          I believe their concern, although they can

4  certainly address it better than I can, was that we not seek

5  to use a lower burden of proof for approving a settlement in

6  order to get around the burdens of proof that may be required

7  to confirm a plan.

8          And, certainly, we are in agreement with them.

9  We're not seeking to get around any burdens of proof in our

10 confirmation order to confirm a plan.  And so, I think we'll

11 be able to address their concern, if we haven't already, by

12 virtue of the evidence that's been provided, the separate

13 motion to settle that was filed, and the form of the

14 confirmation order.

15         And in terms of Mr. Sarachek's objections, we did

16 reach out to him over the weekend to see if our pleadings,

17 our ballot summary and the other evidence had reduced the

18 issues.  He was not willing to respond substantively, so

19 we'll have to find out what is still being pressed.

20         But, broadly speaking, he objects to the Ponzi

21 scheme determination.  He erroneously claims that there has

22 been no evidence in the record of a Ponzi scheme when, in

23 fact, in the very early stages, Mr. Kapila's colleague

24 testified and Mr. Kapila's report was admitted into the

25 record, which I think very clearly lays the groundwork for

1  this being a Ponzi scheme.

2          He claims that notwithstanding this court's order

3  dismissing the complaint with prejudice, to the extent that

4  his clients are determined to be secured creditors on appeal,

5  there are no funds reserved to pay him.  We will address all

6  of these arguments.

7          He challenges substantive consolidation.  He

8  challenges the elimination of intercompany liens and claims

9  saying that a plan cannot settle such issues, which we

10 believe, obviously, is incorrect.  He challenges certain of

11 the voting determinations, although, in fairness, he had not

12 yet seen the ballot report, so I do not know if those remain.

13 And he challenges the treatment of the units versus the

14 notes, if substantive consolidation is approved.

15         I believe he conflates certain issues, Ponzi,

16 substantive consolidation, the lien issues.  But I think it

17 probably makes the most sense to hear from him first as to

18 what he is pressing and then the debtors can respond.

19         At this time, again, it's your courtroom and we'll

20 defer to you, but, at this time, we think it makes sense to

21 admit the declarations of our declarants: Mr. Chin, Mr.

22 Sharp, Ms. Young, and Mr. Kapila.  They are all in court and

23 available for cross-examination, should anyone wish to cross-

24 examine them.

25         And then we would submit that after examination,

1  we can give Mr. Sarachek the opportunity to argue what he

2  wishes to argue and then the debtors and the committees can

3  respond and put on an affirmative case, if the court wishes.

4        THE COURT:  Okay.  Let me just first ask, Mr.

5  Sarachek, whether any grounds for objection are no longer

6  being pressed or whether you're still pressing them all?

7        MR. SARACHEK:  We're still pressing our objection

8  and with respect to Mr. Tuchin's statement, I don't have any

9  record of being contacted by the debtors in an effort to

10 resolve our objection.

11       I did -- our objection -- I'm sorry.  Thank you,

12 Your Honor.

13       Our objection, as you know, had to be filed before

14 the declarations were filed on Friday.  We've been doing an

15 enormous amount of reading and research.  We would like to

16 hear from a couple of the declarants, specifically Mr. Sharp

17 and Mr. Kapila on the Ponzi scheme issue.

18       And as far as our objection that basically the

19 requirements are that each debtor -- that with respect to

20 voting and each debtor, the tabulation, it was unclear from

21 what was filed whether the debtors, in fact, did that.

22 Looked at every specific debtor and it was unclear to us.

23 So, with respect to that declaration, if Mr. Tuchin can clear

24 that up, perhaps, we don't press forward on that specific

25 element of our objection.

1        THE COURT:  All right, thank you.

2        MR. TUCHIN:  Your Honor, on October 21st, I wrote

3   to Mr. Sarachek and his colleague,

4            "Dear Joe & Jonathan,

5            I hope all is well.  In order to streamline the

6            confirmation hearing as much as possible, in

7            effort to reduce costs, it would be helpful to

8            know which objections you intend to pursue and

9            whether you intend to cross-examine any of our

10           witnesses.  We're hoping that the declarations,

11           including especially the balloting declaration,

12           will narrow the issues somewhat."

13           Mr. Sarachek responded,

14           "Michael,

15           Richard and Catherine are copied here.  We need to

16           discuss with them, given the pending motion to

17           disqualify, we will get back to you tomorrow."

18           I will represent to the court that they never got

19   back to me.

20           Thank you, Your Honor.

21           THE COURT:  All right.  So, let's go down the list

22   of declarations that have been offered for admission.

23           First is the Sharp declaration at docket number

24   2829, which includes the Kapila report along with it.

25           Is there any objection to the admission of that

1 declaration?

2        (No verbal response)

3            THE COURT:  I hear none.  It's admitted without

4 objection.

5        (Declaration of Bradley Sharp admitted in evidence)

6            THE COURT:  The Chin declaration -- well, I guess,

7 you had offered the redacted declaration which is at docket

8 number 2833.  Does anyone have any objection to that --

9 admission of that declaration?

10        (No verbal response)

11            THE COURT:  I hear none.  It's admitted without

12 objection.

13        (Declaration of Frederick Chin admitted into evidence)

14            THE COURT:  Next is another Kapila declaration

15 which is at docket 2834 which confirms, he says basically

16 what I said I stand by.

17            Anyone have an objection to the admission of that

18 declaration?

19        (No verbal response)

20            THE COURT:  I hear none.  It's admitted without

21 objection.

22        (Declaration of Soneet Kapila admitted in evidence)

23            THE COURT:  Now, there are two Young declarations;

24 one is at docket 2836 and one at 2855.  The second one

25 corrects the tabulation with respect to voting in classes

1  three and five.

2           Does anyone have any objection to the admission of

3  those two declarations?

4           MR. SARACHEK:  Your Honor, is it possible to ask

5  Ms. Young whether, in fact, the tabulation was done?

6           THE COURT:  You'll have the opportunity to cross-

7  examine, if you like.

8           MR. SARACHEK:  Okay.  That's the only question.

9           And, by the way, let me apologize to Mr. Tuchin.

10 I thought he said he called me.  I misheard but, yes, in

11 fact, he did send me that email.  As you know, there was this

12 --

13          THE COURT:  I understand.

14          MR. SARACHEK:  -- other situation that the

15 committee brought upon us that we were dealing with.

16          THE COURT:  Okay.

17          MR. SARACHEK:  So, I apologize to Mr. Tuchin.

18 Yes, you did send us that email.

19          THE COURT:  Is there any objection to the

20 admission of the two Young declarations?

21          MR. SARACHEK:  Can we -- can I ask her

22 specifically -- can I cross-examine here or not?

23          THE COURT:  You can cross-examine her.

24          MR. SARACHEK:  Okay.

25          THE COURT:  But I'll admit them, subject to your

1  cross-examination.

2             MR. SARACHEK:  Okay.  Thank you, Your Honor.

3             THE COURT:  All right.

4             MR. TUCHIN:  Thank you, Your Honor.  My suggestion

5  would be that we allow Mr. Sarachek to cross-examine the

6  witnesses he wishes to cross-examine.  We reserve our right

7  to redirect.  We'll rely on their testimony in chief and only

8  reserve the right to redirect should it be necessary.

9             THE COURT:  Certainly.

10            Mr. Sarachek, who would you like to cross-examine,

11 beside Ms. Young, if anyone?

12            MR. SARACHEK:  Yeah, so I would like to cross-

13 examine Mr. Kapila.  I'd like to ask him a couple of

14 questions.

15            THE COURT:  All right.

16            MR. SARACHEK:  With respect to the Ponzi scheme

17 issue.

18            THE COURT:  Very well.  Mr. Kapila, will you come

19 forward and be sworn in, please?

20             SONEET KAPILA, DEBTORS WITNESS, SWORN

21            THE CLERK:  Please be seated.  State your full

22 name for the record and spell your last name.

23            THE WITNESS:  My name is Soneet Kapila; K-A-P-I-L-

24 A.

25                      CROSS EXAMINATION

1  BY MR. SARACHEK:

2  Q     Good morning, Mr. Kapila.

3  A     Good morning.

4  Q     How are you?

5        With respect to your declaration, in particular, the

6  report that you did in relation to the SEC complaint, can you

7  -- first of all, did you do any work for this bankruptcy

8  estate?

9  A     I have not done any work for the bankruptcy estate.

10  Q    Okay.  So, other than speaking with Mr. Sharp and

11  representatives, you're not a retained professional in the

12  bankruptcy estate nor have you done any professional work on

13  behalf of the estate?

14  A     I have not rendered any services, professional services

15  to this bankruptcy estate.  I think my office and I, from my

16  recollection, one call in which I sat in with Mr. Sharp.  I

17  can't remember if Mr. Sharp was on that call or not, just to

18  facilitate some transitional information.

19  Q     So, how did it come to pass that you on October 18th

20  submitted this declaration, you know, in support of the

21  debtors' premise that this case is a Ponzi scheme?

22  A     What did you mention, counsel, I apologize?

23  Q     You signed the declaration on October 18th.

24  A     Okay.

25              THE COURT:  Are you speaking, Mr. Sarachek, of the

1  second Kapila declaration that's at docket 2834 that we just

2  admitted?

3          MR. SARACHEK:  Yes, I am.

4          THE COURT:  All right, thank you.

5  BY MR. SARACHEK:

6  A    Okay.  How did it come about that I did -- I was

7  serving as the consultant and expert to the Securities and

8  Exchange Commission.  They're the ones who got my

9  declaration.

10 Q    This declaration that's submitted to the bankruptcy

11 court?

12 A    May I have a look at it?

13 Q    Sure.

14          MR. SARACHEK:  Can I --

15          THE COURT:  Yes, you may.

16 BY MR. SARACHEK:

17 A    Oh, I see.  My apology.  This is the declaration I just

18 signed on October 18.  I was confused with the main

19 declaration which was signed last -- in December.  That's why

20 I was confused about the date.  I now understand the

21 declaration you're referring to.

22        I signed this declaration in the context of, I guess,

23 of adopting my words, my original declaration which was

24 filed, dated, I think, December of last year.

25 Q    Can you just tell me with respect to your original

1  declaration in December of 2017 and the work behind it, how

2  many months of work was it -- can you give us some background

3  about your work product there, your declaration?

4  A    Sure.  We were retained by the Securities & Exchange

5  Commission sometime in the -- I don't have the precise date,

6  but it was in the earlier part of 2017.  Perhaps in the first

7  quarter or thereabouts.

8       And our work extended over all the months that past by

9  during the year in stages because we did the work, then we

10  needed more information.  We conferred with the SEC.  They

11  needed a subpoena or however they obtained additional

12  information, so it came in spurts.

13       And as the information came, my office, my

14  professionals and myself analyzed that information and it

15  kept developing over the stages and culminating in the

16  reconstructions that were done and the analyses that were

17  performed.  And, ultimately, the December 2017 declaration.

18  Q    Sure.  Where's your office located?

19  A    Fort Lauderdale, Florida.

20  Q    And did the SEC give you all of the information or did

21  you travel to California and other places to gather the

22  information?

23  A    I did not travel anywhere.  Our entire communication

24  line was with the SEC.

25  Q    So, whatever the SEC gave you, you analyzed, is that

1  accurate?

2  A    That is correct, yes.

3  Q    Okay.  With respect to, and you have a statement in

4  your declaration that you give the SEC definition of a Ponzi

5  scheme -- with respect to -- did you do a chronology of this

6  business?  Did you look at the inception of the business and

7  then bring it forward to current?

8  A    I believe the answer to your question would be yes.  In

9  the context of the reconstruction we did which started from

10  early 2012 onwards or it was July 2012.  So, if you call that

11  the chronology, the reconstruction was from that period

12  onwards through September of 2017.

13  Q    Did you look at the business on a debtor-by-debtor

14  basis?

15  A    Well, when we did the work, there was no debtor in

16  existence.

17  Q    I'm sorry; entity by entity basis?

18  A    We had the bank records for each of the entities.  The

19  bank accounts which are listed actually by an exhibit in my

20  declaration.  So as to -- if there was a bank account for any

21  entity that was produced to us, yes in that context it was on

22  an entity by entity basis.

23  Q    When you were doing this study, did you ask the SEC for

24  more information?  Did you indicate to them that you didn't

25  have the full amount of information that you might ordinarily

1  need?

2  A     I don't know if I said to them, we don't have the full

3  information that we don't ordinarily need.  But every time,

4  as I indicated earlier, in spurts we were noticed.  We are

5  identifying any additional bank accounts because sometimes

6  the traces of money would help you do that.

7        If we wanted to connect the dots, we would go back to

8  the SEC and advise them of that and they would make every

9  effort they can to try and obtain the information and provide

10 it to us.

11 Q     Were you -- in your analysis, did you see elements of a

12 legitimate real estate business with respect to the

13 Woodbridge cases as a whole?

14 A     The book value of the real estate which we noted was

15 recorded in the records was about $11 million of real estate

16 on that was apparent.  There was no real estate being shown

17 in the reconstruction or in the record that we saw as owned

18 real estate because the primary business model was to loan

19 money to borrowers for the purpose of financing real estate.

20 So, real estate ownership, per se, was not the key element in

21 the business model.

22 Q     So, for the purposes of your analysis, what you are

23 really looking at is a lending business, not a real estate

24 company that owns significant real estate?

25 A     Well, we were looking at anything and everything that

1  the cash flow transactions would demonstrate.  And we were

2  looking at the memorandums that were used for the borrowing.

3  We were looking at the websites.  We were looking at the

4  model that they were allegedly promoting which, essentially,

5  was to create income by way of the margin the business would

6  get if it was a business.  Between the interest they paid to

7  investors and the interest they were going to get from

8  borrowers, and that would be their source of income, if they

9  made any income.

10  Q     did you ever speak to anyone at the company?

11  A     No, sir.

12  Q     You never spoke to anyone, any finance person at the

13  company?

14  A     No, that would not be in the cards because I was

15  retained by the Securities & Exchange Commission and my

16  contact would be directive of the SEC.  I don't think I would

17  have the ability to pick up the phone and cavalierly call the

18  company's management.

19  Q     So, you really had no way of knowing whether the

20  business, at one point, was "legitimate" or whether it was

21  never -- it never had a valid purpose for being?

22  A     Well, I do know because the reconstruction tells me

23  what the business actually did versus what it may have

24  proposed to do.  That's the reality is the cash transactions

25  for that period of time and they are clearly demonstrative of

1 the fact that this company was not earning income or profits

2 sufficient to meet the obligations it was promising to the

3 investors.

4 Q    How many hours did you spend on this project, if you

5 know?

6 A    It was well over a thousand billed hours during that

7 period of time.  I don't have a precise number.

8 Q    And was it you and several associates or primarily?

9 A    No, it's a team effort.  I mean it's a large enough

10 project that it's not a single person project and we had

11 professionals at different skill levels.  And that involved

12 myself, my partner, Melissa Davis who testified here during

13 the early bankruptcy hearing, and some professional staff

14 below her at the analytical level.

15 Q    At the outset of your engagement, did the SEC tell you

16 this is a Ponzi scheme or a fraud and here's what we want you

17 to prove?

18 A    No, they did not.  The scope was simply to try and

19 analyze the records and the banking transactions.

20 Q    Okay.

21        MR. SARACHEK:  Your Honor, can I have one moment?

22        THE COURT:  Yes.

23        MR. SARACHEK:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        Would anyone else like to cross-examine Mr.

1  Kapila?

2       (No verbal response)

3            THE COURT:  Is there any redirect?

4            MR. TUCHIN:  I'll be very brief, Your Honor.

5  BY MR. TUCHIN:

6  Q    Thank you for being here, Mr. Kapila, and thank you to

7  the SEC for making Mr. Kapila available to us.

8       Mr. Kapila, could you briefly describe your experience

9  analyzing Ponzi schemes?

10 A    I would say it's very extensive.  There is an exhibit

11 to my original declaration which expounds on it.  I'm a

12 federal bankruptcy trustee.  I've handled cases as a trustee

13 which have been Ponzi scheme cases.  One of the landmark

14 cases I handled was the Louis Pearlman case in Orlando in the

15 Middle District of Florida and the Transcontinental which is

16 about a half million-dollar Ponzi scheme.  And then I had

17 several others I'm involved in, I was.

18      I was involved in representing a very large major

19 creditor group in the Rothstein bankruptcy case in Florida.

20 And aside of that, my firm and I have represented numerous

21 fiduciaries, regularly receivers, in SEC or FDC and CFTC

22 cases as the forensic accountants.

23      I've also served as an expert witness for the, I guess,

24 the U.S. Government of the Department of Justice in some

25 Ponzi cases.  So, I think that's the best way to capture it.

1  Q      Thank you.  And it is your professional opinion that

2  this was as Ponzi scheme?

3  A      It is my professional opinion. As I said in my

4  declaration, it has numerous of the attributes of a Ponzi

5  scheme.  I normally leave the decision to the trial of fact

6  as to, but, in my view, that's what it is.

7  Q      Thank you.  And do you recall the date as to which you

8  opine the Ponzi scheme initiated?

9  A      It would be no later than the date I signed the

10 declaration which was, I believe, December 17 or 18 of 2017.

11 Q      But the date that the Ponzi scheme began?

12 A      It began a lot sooner than that in my view because I

13 analyzed the impact of the transactions and the cash flows

14 going back to July of 2012 and I could see where they

15 indicate in the reconstruction that they went on a quarter by

16 quarter basis.  This entity or these entities were not

17 generating sufficient cash flows by way of working capital or

18 income to be able to support the obligations they were

19 incurring.  And all the records were showing they were

20 accursing book entry item but there was no cash transaction

21 to support them.

22 Q      So, I guess, what I'm saying the cash did not match the

23 book entries the way the cash --

24 A      Clearly not.

25 Q      Thank you.  And so, from inception of Fund I which was

1  in the June/July period, you believe since the inception this

2  was a Ponzi scheme?

3  A      That's my belief, sir.

4  Q      Thank you.  And then I take it you continued to believe

5  as you stated in your findings that while there was a real

6  estate portfolio, the business enterprise did not generate

7  sufficient profits to pay the promised return to investors?

8  A      That is correct.

9  Q      And that the business activities were not consistent

10 with the model that you indicated was promoted and materials

11 you reviewed?

12 A      That is correct, sir.

13 Q      And that investor money was, in fact, used to pay the

14 large percentage of the returns promised to the earlier

15 investors?

16 A      Yes, sir.

17 Q      Thank you.

18         MR. TUCHIN:  Nothing further.

19         THE COURT:  Any recross?

20         MR. SARACHEK:  Nothing.

21         THE COURT:  Thank you, sir.  You may step down.

22         THE WITNESS:  Thank you, Judge.

23     (Witness excused)

24         THE COURT:  Mr. Sarachek, who else would you like

25 to cross-examine?

1        MR. SARACHEK:  Mr. Sharp.

2        THE COURT:  Mr. Sharp, will you come forward and

3   be sworn in, please?

4         BRADLEY SHARP, DEBTORS' WITNESS, SWORN

5        THE CLERK:  Please be seated. State your full name

6   for the record and spell your last name?

7        THE WITNESS:  I'm Bradley Sharp.  Last name is

8   Sharp; S-H-A-R-P.

9        THE CLERK:  Thank you, sir.

10                     CROSS-EXAMINATION

11  BY MR. SARACHEK:

12  Q    Good morning, Mr. Sharp.

13  A    Good morning.

14  Q    So, in referring to your declaration which is document

15  2829 in the docket, you attach Mr. Kapila's declaration and

16  you attach his study.  Did you do any independent forensic

17  investigation yourself?

18  A    My firm did, yes.

19  Q    And what was that?  Can you describe what you did?

20  A    Certainly.  We utilized the work that Mr. Kapila and

21  his firm had done and the SEC was quite helpful in providing

22  data to us.  But Mr. Kapila's data, you know, ended in

23  September of 2017, so we had to complete it for the rest of

24  the prepetition period.

25        We also had much greater access to the books and

1  records of the debtors because, obviously, we were in

2  possession of the books and records of the debtor.  So, we

3  could take what Mr. Kapila had done and then add to it from

4  the existing books and records, you know, the QuickBooks

5  files we had, additional bank statements, conversations with

6  the remaining employees at Woodbridge.  And so, we could then

7  take that what had already been done and then build from it

8  to reach our own conclusions.

9  Q    Did you in the course of having conversations with

10 Woodbridge employees, also speak to Mr. Shapiro?

11 A    No, I have not.

12 Q    Okay.  How about anyone in their legal department?

13 A    Yes.

14 Q    And were you aware that security documents were filed

15 relating to various properties, whether their collateral

16 assignment of security interest, various documents were filed

17 in the -- certainly in the LA accounting recorder's office,

18 were you aware of that?

19 A    I reviewed the documents that were given to investors

20 and the documents that Woodbridge has and some that were

21 filed with the county.

22 Q    And in reviewing those documents, did you find any

23 valid perfected secured interest in Los Angeles?

24           MR. TUCHIN:  Objection.

25           THE COURT:  Sustained.

1  BY MR. SARACHEK:

2  Q     In reviewing those documents, were part of those

3  documents that you reviewed filed in the LA County Recorder's

4  Office?

5  A     I believe so.

6  Q     Were there -- I understand that you're not a lawyer.

7  A     That's correct.

8  Q     But you did speak to the legal department, correct?

9  A     Yes.

10 Q     And what did they say the purpose of filing those

11 documents were?

12        MR. TUCHIN:  Objection, Your Honor.  Any

13 communications with counsel would be privileged.

14        THE COURT:  Any response?

15        MR. SARACHEK:  Look, Your Honor, I'm trying to

16 show that there was a legitimate -- there was a procedure

17 that was followed by the Woodbridge Group of Companies.  And

18 I'm asking Mr. Sharp whether he was -- he clearly testified

19 that he spoke to people in the legal department who filed

20 these documents.

21        So, what I'm inquiring of Mr. Sharp is, you know

22 his opinion as to why that was done.

23        THE COURT:  Well, you can ask him that question if

24 you like.

25 BY MR. SARACHECK:

1  Q    Why do you think the legal department filed documents
2  with the LA County Recorder's office?
3  A    To make the investors happy.  To show -- to give the
4  impression that there was collateral.
5  Q    So, it's your belief that the legal department
6  perpetrated a fraud?
7  A    I think it's certainly my belief that a fraud was
8  perpetrated.  You know, had I sat down and said that certain
9  people are responsible for certain pieces of it, no I have
10 not done that part.  There certainly was a fraud that was
11 perpetrated.
12 Q    When you were hired, you reviewed the collective
13 balance sheets of the debtors, correct?
14 A    I guess, I'm going to have to have you be more
15 specific, which debtors?
16 Q    Well, I'm talking when -- the 306 debtors, you know.
17 You in your declaration talk about asset values and so, and
18 you also talk about liabilities.  So, if you would, what do
19 you believe today the aggregate asset value -- what do you
20 believe the aggregate asset value was at the time that you
21 were retained?
22 A    Well, I guess, let me answer it several ways.  When we
23 came on, there were no financial statements that had been
24 prepared.  The property-owning debtors did not have their own
25 separate books and records.  There was not a -- they utilized

1 QuickBooks for the entire operation.

2      The individual operating debtors did not have their

3 QuickBooks.  So, everything was comingled and mixed.  And as

4 near as we could tell, there really wasn't a -- there

5 certainly wasn't a balance sheet for each debtor.  There was

6 some sporadic financial information, but there really wasn't

7 financial statements prepared for the debtors.

8      So, at the time we came onboard, there really wasn't a

9 lot of information about the value of the properties.

10 Fortunately, the debtor at the same time I was employed, Mr.

11 Fred Chin who had done some valuation work before as a part

12 of the DIP, and then he continued to update that data on the

13 value of the properties.

14      We even had trouble digging through the books and

15 records to find out the costs of each particular property.

16 You know, what was the cost?  What had been spent on it?  The

17 date -- that was something that was developed over time

18 through our forensic accounting analysis.

19 Q    Okay.

20           MR. SARACHEK:  Can I, Your Honor, approach him

21 with this declaration?

22 BY MR. SARACHEK:

23 Q    I'm turning to page 9 where you basically say in 2013

24 no properties were sold and approximately $3.4 million was

25 paid to investors in principal and interest.

1        On page 10, you say in 2014 no properties were sold and

2    approximately $17.6 million was paid to investors in

3    principal and interest.

4        In 2015, ten properties with approximately net proceeds

5    of 18.5 and approximately $84.1 million.  So, clearly, you

6    did do a chronology here.  Were there elements of this

7    business that were legitimate?  Were there elements of this

8    business that were legitimate?

9    A    No.

10   Q    So, what are these transactions?

11   A    Exactly what it says; they were asset sales.  You're

12   missing there is the investments that were made by the

13   investors required monthly payments.  These sporadic asset

14   sales were not at all sufficient to cover the interest carry

15   and this was the only source of cash-flow.

16       I think as Mr. Kapila said the public business model

17   where Woodbridge was going to be making loans to developers,

18   those loans would then generate cash-flow which would pay the

19   interest to the investors.  Well, we have since learned there

20   were no loans.  These were just funding two related party

21   entities.  So, there wasn't a structure in place that could

22   service the investors and the asset sales were nowhere near

23   sufficient in order to do that.

24   Q    Today, what are the aggregate assets and liabilities of

25   the debtors?

1  A    I think if you look at the disclosure statement and you

2  look at the values from the business plan and then the

3  various estimates of liabilities those are pretty consistent

4  with what we see right now.

5  Q    Well, what's the number?

6  A    I don't have that disclosure statement in front of me.

7  Q    Was the number something like 800 million and 1.2

8  billion of liabilities; 800 million of assets and 1.2 billion

9  of liabilities?

10 A    I think if you look at the schedule to the disclosure

11 statement that shows what the value is.

12 Q    Okay.  So --

13 A    So, if you put that in front of me we can walk through

14 that.

15         MR. SARACHEK:  Okay.  Your Honor, do you mind if I

16 grab the disclosure statement?

17         THE COURT:  Go right ahead.

18 BY MR. SARACHEK:

19 Q    So, if you look at the projected analysis that's

20 attached to the disclosure statement, which this is docket

21 2398, this is Page 216 of 576, it shows the total assets of

22 $601.8 million dollars.  And then on the total claims, again

23 this was the estimate of claims, close to a billion dollars'

24 worth of claims.

25 A    Okay.

1   Q     And to date how much -- in the aggregate how much real

2   estate has been sold if you recall?

3   A     I don't recall.

4   Q     A couple hundred million?

5   A     Probably.  I don't recall.  I'm focused, obviously, on

6   the forensic accounting and the bankruptcy piece.

7   Q     Okay.  So, even if the stated purpose of this business,

8   which was a real estate lending business wasn't valid.  In

9   fact, if noteholders had a lien on properties wouldn't they

10  have an interest in the assets which, you know, at the time

11  that this bankruptcy commenced it was approximately $800

12  million dollars?

13  A     Again, I don't know the value at the time the

14  bankruptcy was commenced.  That's a pretty broad brush

15  dealing with the investors because they were investors that

16  were theoretically invested at particular properties.  There

17  were investors that were invested at the mezzanine level.  So

18  they really didn't have a particular property, so they were

19  not even theoretically secured.  Then there were investors

20  that were theoretically at a property that Woodbridge didn't

21  even own.  So, they, obviously, didn't have an interest in

22  that property because none of the Woodbridge debtors actually

23  owned that property; that was still just in the planning

24  stage.

25        So, that would be -- I would hesitate to paint that

1  broad of a brush because it's got to be much more detailed

2  then that.

3          MR. SARACHEK:  Okay.  Thank you.  Thank you, Your

4  Honor.

5          THE COURT:  Does anyone else like to cross-examine

6  this witness?

7      (No verbal response)

8          THE COURT:  Any redirect?

9          MR. TUCHIN:  Thank you.  Again, I will be very

10 brief, Your Honor.

11                    REDIRECT EXAMINATION

12 BY MR. TUCHIN:

13 Q    Mr. Sharp, I take it you still stand by everything

14 that's in your declaration?

15 A    I do.

16 Q    I take it -- well, let me just ask you; you've reviewed

17 the notes and the units, the form of the notes and the units?

18 A    I have.

19 Q    And the notes, what do they provide in terms of

20 interest payments?

21 A    Monthly interest payments.

22 Q    So, from the very first day a note was issued what was

23 the source to make that first interest payment?

24 A    The only source that Woodbridge had was the sale of

25 assets.  There was no third-party borrower.  So, that's all

1 they had or, unfortunately, new investor money.

2 Q      Right.  And as you've testified there were no sales in

3 the first two years?

4 A      That's correct.  The only cash they had was from new

5 investors.

6 Q      Thank you.  That was not was described to investors,

7 was it?

8 A      No.

9 Q      As you sit here today can you track an individual

10 investor's contribution to a fund to any specific piece of

11 property?

12 A      No.  That's not possible.

13 Q      And do you believe with additional time you could track

14 an individual investor's investment to a specific piece of

15 property?

16 A      No.  That is not possible.

17 Q      And why is that not possible?

18 A      The way Woodbridge manages business the money from the

19 investors came into a fund bank account and was left there

20 and comingled with other investors.  So, that's the first

21 comingling.  Periodically, round numbers were transferred

22 from the fund to Woodbridge Group or to structure in the

23 early days.  Then, round money was transferred from either

24 group or structured to typically an attorney trust account

25 and that trust account then money was sent to escrow to

1  purchase property.

2       So, the investor money was first comingled at the fund,

3  then the fund money was comingled at Woodbridge Group and

4  then Woodbridge Group money was comingled further at the

5  attorney trust account level.  So, there is -- it is

6  impossible to trace the money from the investor to the

7  property because there are three different places where it's

8  comingled.

9  Q    And, again, I just want to follow-up.  There are

10 circumstances where an investor thought they were getting an

11 assignment of a lien for a piece of property that the debtor

12 never acquired?

13 A    That's correct.  The documents that were sent to the

14 investor referenced a specific property and the collateral

15 documents referenced a specific property.  The debtor or its

16 related entities did not own that property.  The purchase had

17 never gone through.

18 Q    So, as you sit here today can you establish that the

19 notes given by a Propco debtor a fund represent a fair

20 portrayal if it was actually loaned to that fund?

21 A    No, not at all.

22 Q    You can't, as you sit here today, say whether it, in

23 fact, bears any semblance to reality?

24 A    Well, I can say there is not any semblance to reality.

25 The money did not go from the fund to the property-owning

1  debtor where the note is reflected.  The money stayed at the

2  fund and was used to pay other investors.  Some of it went to

3  group and some of it went to -- you know, and on, and on, and

4  on as I was previously describing.  Only a very minor amount

5  went from a fund to a property-owning debtor.

6       So, the note between the property-owning debtor and the

7  fund no consideration as exchanged for that note.  It's a

8  fictitious piece of paper.

9  Q    Thank you.

10      In fact, I believe you testified with regard to the

11 Owlwood property that the face amount of the note exceeds the

12 amount that was spent on that property, is that correct?

13 A    Correct.  More was borrowed from investors then the

14 purchase price for the property.  It oversubscribed

15 producers.

16 Q    Right.  And when you say more was borrowed you don't

17 actually know what was borrowed, correct?

18 A    No.

19 Q    You just know that the note exceeds the amount that was

20 spent to purchase the property?

21 A    Well, I guess when I say what was borrowed what the

22 funds borrowed for investors that they said was for Owlwood.

23           MR. TUCHIN:  Thank you.  Nothing further, Your

24 Honor.

25           THE COURT:  Thank you.  Any re-cross?

1                        RECROSS EXAMINATION

2  BY MR. SARACHEK:

3  Q    Mr. Sharp, are you aware of how the Hankey Capital, the

4  debtor-in-possession lender, chose certain properties to

5  obtain security on and didn't choose others?  Are you aware

6  of that?

7  A    I am.

8  Q    How did they come to that?

9  A    Obviously, I was not there at the time and after the

10 fact, but in my conversations with the Hankey Capital people

11 they represented to me that they were just given a list by

12 the debtor of here are the properties that we want to provide

13 collateral to you.  So, it was the debtor that chose them and

14 selected those properties for them?

15 Q    And are you aware that various noteholders were served

16 with notice that property which they had an interest in was,

17 you know, being -- that the debtor-in-possession loan was

18 actually coming on top of them on that property.  Are you

19 aware of that?

20 A    I guess I characterize that differently.  I was aware

21 that investors received notice as they should have, that a

22 property that they claimed an interest in was being pledged

23 as collateral.  So, I am aware of that notice to the

24 investors.

25 Q    Are you aware of how much due diligence Hankey Capital

1  did prior to entering into the debtor-in-possession loan?

2  A    I don't.  I wasn't there at the time.

3  Q    Are you aware that they were planning with Mr. Shapiro

4  to recapitalize the entire company?

5  A    I have not had that conversation with him.

6           MR. SARACHEK:  Okay.  Thank you.

7           MR. TUCHIN:  Nothing further, Your Honor.

8           THE COURT:  Thank you, sir.  You may step down.

9           THE WITNESS:  Thank you.

10      (Witness excused)

11           THE COURT:  Mr. Sarachek, would you like to cross-

12  examine anyone else?

13           MR. SARACHEK:  With respect to the -- I'm sorry.

14  What's her name, Michael?

15           MR. TUCHIN:  Ms. Young.

16           MR. SARACHEK:  Yes.  Ms. Young.

17           THE COURT:  Very well.  Thank you.  Ms. Young,

18  will you please come forward and be sworn in.

19                EMILY YOUNG, WITNESS, SWORN

20           THE CLERK:  Please be seated and state your full

21  name for the record and spell your last.

22           THE WITNESS:  Emily Young, Y-O-U-N-G.

23                    CROSS EXAMINATION

24  BY MR. SARACHEK:

25  Q    Good morning, Ms. Young.

1    A    Good morning.

2    Q    I really only have question which goes to, sort of,

3    methodology in the tabulation of the ballots.  Did you

4    tabulate ballots for each of the 306 debtors?

5    A    We did not receive valid ballots for all debtors.

6    There is attached to the declaration an exhibit showing a

7    debtor by debtor analysis of the ballots received.

8    Q    So, you didn't receive ballots for every debtor?

9    A    Correct.

10             MR. SARACHEK:  Okay.  Thank you.

11             THE COURT:  Any redirect?

12             MR. TUCHIN:  No.

13             THE COURT:  Thank you.  You may step down.

14        (Witness excused)

15             THE COURT:  Mr. Sarachek, do you want to cross-

16    examine Mr. Chin?

17             MR. SARACHEK:  No thank you, Your Honor.

18             THE COURT:  All right.  Do you have any of your

19    own evidence to present?

20             MR. SARACHEK:  I do not.  We filed an objection,

21    Your Honor.  I am not going to repeat all that's in the

22    objection. It's before the court.  I understand that Mr.

23    Tuchin may want to, you know, refute some of our legal

24    arguments.

25             THE COURT:  I get that feeling too.

1      (Laughter)

2           MR. SARACHEK:  Mr. Pachulski might say a word or

3  too, but no.  Thank you, Your Honor.

4           THE COURT:  All right.  Thank you.

5           So, I guess at this point I guess there's

6  agreement that the evidentiary record has closed.  All right.

7  It would now normally be time for argument.  Would anybody

8  like a short break before we do that or shall we just jump

9  right in?

10          UNIDENTIFIED SPEAKER:  We're prepared to continue,

11 Your Honor.

12          THE COURT:  All right.  I'll hear first from the

13 debtor and then anyone else who wishes to speak.  I'll give

14 Mr. Sarachek the last word.

15          MR. HOLT:  Thank you, Your Honor.  Good morning.

16 Whitman Holt from Klee Tuchin Bogdanoff & Stern on behalf of

17 the debtors and debtors-in-possession.

18          Your Honor, with regards to the statutory elements

19 for confirmation under Bankruptcy Code Section 1129, of

20 course, the debtor bears the burden of proof.  We filed a

21 detailed memorandum of law that's at docket number 2828 that

22 outlines the statutory elements.

23          I'm going to save the court unless the court would

24 prefer the oral checking the box on all of the elements,

25 particularly the ones that are uncontested.  I'll focus on

1  the points raised by Mr. Sarachek on behalf of his clients

2  which, I think, he appears to be pressing all of them.

3         THE COURT:  I've read the submissions including

4  the memorandum of law.  So, I don't need the dramatic reading

5  from the podium.

6         (Laughter)

7         MR. HOLT:  Thank you, Your Honor.

8         Before I get to the specific points I do want to

9  note for the record, particularly the liquidation analysis

10  prepared by DSI and included with the disclosure statement at

11  Exhibit B, as well as the Sharp declaration at Paragraphs 34

12  to 39 readily establishes the best interest of creditors test

13  under Section 1129(a)(7), Your Honor. Importantly, that

14  analysis included multiple scenarios.

15         DSI prepared a noteholder high-case that assumed

16  that the noteholders received all distributable value that's

17  available in a Chapter 7 scenario.  They also prepared a

18  unitholder high-case that made a *pari passu* assumption.

19  Neither of those results would obtain absent very long and

20  hard-fought litigation, but they prepared the analysis to see

21  what those numbers showed.

22         What the results showed, Your Honor, is that in

23  all possible scenarios noteholders and unitholders do better

24  under the plan then they do in Chapter 7.  This satisfies

25  Section 1129(a)(7) and there's no contrary argument let alone

1  any contrary evidence from Mr. Sarachek or anyone else.

2         The reason I'm mentioning this, Your Honor, is

3  that the bankruptcy code contains two provisions that protect

4  parties that are similarly situated to Mr. Sarachek's

5  clients; parties that are descending minority holders and a

6  class that's overwhelmingly accepted the plan.  Those two

7  statutory protections, Your Honor, are first 1123(a)(4).  The

8  bankruptcy code does not allow parties to be classified

9  within the same class and allow a majority or members of the

10  class to receive special treatment that the minority is not

11  receiving.  Your Honor, that's not happening here.

12         Everyone that is in Class 3, Class 4, Class 5 and

13  Class 6 is receiving the same treatment or with respect to

14  elections and options that were available under the plan had

15  a full and equal opportunity to receive and make their choice

16  about what they wanted to receive under the plan.  So,

17  1123(a)(4) satisfied, and there's really no dispute about

18  that.

19         The second bedrock protection, Your Honor, is

20  Section 1129(a)(7).  Again, as I just noted the evidence re-

21  soundly shows that the best interest of creditors test is

22  satisfied.

23         So, those are the two primary protections for Mr.

24  Sarachek's clients.  They're not disputed and they're

25  satisfied.  The rest of his issues, Your Honor, largely go to

1  issues that can be addressed on a class by class basis and as

2  the ballot tabulation shows, and I'll summarize briefly in a

3  moment, all the classes in which his clients are situated

4  have overwhelmingly accepted the plan.  What that means, Your

5  Honor, as a basic principal of bankruptcy law is that his

6  clients are bound whether they like it or not to the

7  overwhelming majority vote in acceptance of the plan by the

8  classes in which they were classified.

9          Just so the record is clear, Your Honor, there has

10  been no argument, nor could there be one, that there's been

11  any improper classification or that the classes that were

12  constructed and solicited under the plan were improperly

13  formulated.

14          So, Your Honor, I would like to briefly go through

15  what I think are the six points we tried to distill out of

16  Mr. Sarachek's responses.  We noted it was not structured in

17  a systematic way.  So, we tried to reformulate the arguments

18  as best we could to address them.

19          The first argument which we heard briefly this

20  morning, Your Honor, is that the Sarachek parties contend

21  that they're secured.  They also contend that there needs to

22  be a reserve or other mechanism established for them under

23  the plan in order to deal with the contingent probability

24  that Your Honor reverse on appeal.

25          THE COURT:  So, other than Owlwood what are the

1  properties that are subject to alleged liens?

2          MR. HOLT:  Your Honor, I don't have a detailed

3  listing, but there are additional properties that are out

4  there.  Mr. Sarachek's client group seems to be shifting and

5  every moving.  There was a recent adversarial proceeding

6  filed earlier this month that includes a broader plaintiff

7  group then the group that was -- the plaintiff group in the

8  Owlwood proceeding that your court determined.

9          From the debtors' perspective, Your Honor, we

10 don't think the analysis is going to be substantially

11 different, but there are other properties in which there are

12 asserted intercompany security interest that will be

13 eliminated under the plan settlement and also that Mr.

14 Sarachek may be asserting direct interest in the same theory

15 that he lost earlier this month.

16          THE COURT:  Ballpark, any idea how many?

17          MR. HOLT:  There are quite a few.  None as

18 valuable as Owlwood, Your Honor, but I mean there are 10 or

19 more individual properties in which a similar argument could

20 be made that hasn't been made.

21          THE COURT:  Thank you.

22          MR. HOLT:  So, Your Honor, with respect to what

23 should happen pending appeal during the pendency of his

24 appeal Mr. Sarachek offers zero analysis in his response as

25 to why Your Honor is likely to get reverse.  We, obviously,

1  don't think Your Honor is likely to be reverse.  There is

2  some theoretical non-zero chance that could happen.  Mr.

3  Sarachek certainly made no case or made any explanation.

4         THE COURT:  I never develop any odds myself on

5  that.

6      (Laughter)

7         MR. HOLT:  That's fair enough, Your Honor.

8         So, no stay was sought in the language of a stay

9  pending appeal.  There certainly has been no substantial

10 grounds or any grounds, really, for reversal that have been

11 shown.  Your Honor, what happens in the meantime is not a new

12 issue.  This is an issue that is dealt with in the case law

13 including case law in this district.

14        I'd point Your Honor, District Judge Sleet wrote

15 an opinion in the Washington Mutual case where Bankruptcy

16 Judge Walrath had made certain decisions during the middle

17 part of the case.  There was a pending appeal.  The parties

18 who had lost objected to confirmation of the Washington

19 Mutual plan.  They also tried to get District Judge Sleet to

20 stop confirmation from going forward.  District Judge Sleet

21 said there's an un-stayed ruling of the Bankruptcy Court;

22 although, there's a pending appeal that does not prevent the

23 Bankruptcy Court from going forward with plan confirmation

24 predicated on the correctness of Judge Walrath's earlier

25 decision.  Judge Walrath can give effect to her decision

1 notwithstanding the pendency of the appeal.

2        Similarly, in the <u>Oakwood Homes</u> case, Your Honor,

3 District Judge Farnan dealt with a similar issue arising out

4 of an appeal from a case before Bankruptcy Judge Walsh.  The

5 debtors had objected to a claim, Judge Walsh had disallowed

6 the claim, there was a pending appeal by the losing party,

7 the losing party objected to confirmation and said I need a

8 reserve established under the plan.  Bankruptcy Judge Walsh

9 said no, I disallowed the claim notwithstanding your appeal;

10 that's my ruling, I believe it was correct.  He established a

11 zero dollar reserve under the plan.  The losing party

12 appealed and District Judge Farnan wrote an opinion,

13 published opinion, saying, no, that's correct.  The

14 Bankruptcy Court can give effect to its prior ruling.  It

15 does not need to establish any reserve for a claim that's

16 been disallowed notwithstanding the pendency of the appeal.

17        With regard to the theory that we're hearing from

18 Mr. Sarachek, Your Honor, we cited in our papers a decision

19 from Bankruptcy Judge John Hoffman, Jr., in Ohio dealing with

20 very, very similar facts in which a party asserted it had a

21 security interest in property of the debtor.  Judge Hoffman

22 said, no, you're wrong.  The party appealed to the back.  The

23 back appeal was pending when the debtor's plan was before

24 Judge Hoffman.  The losing party said well, Your Honor, the

25 plan's not confirmable because I'm asserting a security

1   interest.  Even though I lost I'm pursuing an appeal.  Judge

2   Hoffman said, no, that's not correct.  I ruled that your

3   unsecured, the debtor's plan gives effect to my ruling, the

4   pendency of your appeal is out there, but you haven't

5   established any basis for disagreement with my prior ruling.

6   The debtor's plan can appropriately go forward and give

7   effect to that ruling.

8          So, Your Honor, that's the case law.  That is what

9   the case law teaches us, that Mr. Sarachek is simply wrong

10  about this.

11         THE COURT:  Does the plan anticipate that with

12  respect to any post-confirmation property sales that court

13  orders will be sought or does it provide for another process?

14         MR. HOLT:  The plan and the wind-down LLC

15  agreement reserve the right of the entities that come to

16  court and seek relief under Section 363 if they believe

17  appropriate.  It's not obligatory, but I suspect there may be

18  buyers who want that relief and the court would see those

19  sorts of motions.

20         The second point, Your Honor, with respect to the

21  secured creditor litigation theory is, again, the collateral

22  in which Mr. Sarachek's parties are asserting an interest or

23  the intercompany notes and intercompany mortgages between the

24  fund debtors and the Propco debtors.  As Mr. Sharp testified

25  moments ago it's largely a loosery paper.

1          Under the plan, as part of the global settlement,

2    those intercompany notes and liens will be extinguished upon

3    the effective date.  We think in large part that moots the

4    issues that Mr. Sarachek has been pursuing and may pursue on

5    appeal because if the underlying asserted collateral, what

6    they assert they have a security interest in is eliminated,

7    which it will be under the plan, it's purely academic whether

8    they have a security interest in that asset or not because

9    the asset no longer exists.  A security interest in nothing

10   is the same thing as no security interest in nothing, Your

11   Honor.

12          I will get to that aspect of the plan in just a

13   moment because they're challenging that part of the

14   settlement, but we think that moots out and eliminates

15   separately the vast majority of what Mr. Sarachek's been

16   pursuing and may continue to pursue on appeal.  So, Your

17   Honor, we think this objection should be overruled and that

18   there's no basis, in the case law or otherwise, to require

19   any reserve or other modification to the plan to address

20   their appeal or to address this general issue.

21          The second issue that Mr. Sarachek raises is

22   whether or not there's a Ponzi scheme, Your Honor, and he

23   claims that there's been no evidence.

24          THE COURT:  You can move on.

25          MR. HOLT:  Okay.  Thank you, Your Honor.

1              The third issue that Mr. Sarachek raises is the

2    propriety of substantive consolidation, Your Honor.  Here,

3    the case law, including Owens Corning, teaches that entities

4    may properly be substantively consolidated with creditor

5    consent.  Here, all classes of creditors who are affected by

6    the substantive consolidation, the noteholders, general

7    unsecured creditors, the unitholders have voted by

8    overwhelming margins to accept the plan and we think provided

9    consent to the substantive consolidation.

10             I'd note, Your Honor, at the other debtors' level,

11   Woodbridge Group and the Property Co.'s, consent to

12   substantive consolidation as unanimous among all creditors

13   who voted.  There was no creditor who's a creditor of

14   Woodbridge Group of Companies, or the Propco's, or Mezco's

15   below Woodbridge Group of Companies who objected.  So, we

16   have broad based consent at that level, Your Honor.

17             That puts this case into the consent justification

18   and at the fund levels, Your Honor.  I'd point the court to -

19   - Mr. Sarachek raised questions about the debtor by debtor

20   voting analysis Ms. Young attached as Exhibit A to her

21   declaration and chart that broke down each class by each

22   debtor.  On a debtor by debtor basis every group of

23   unitholders and noteholders that each debtor voted to accept

24   the plan.  So, that does two things, Your Honor.

25

1          First, as I'll touch on in a moment, it provides

2    an impaired accepting class at every one of the fund entities

3    on a stand-alone basis.  Second, it provides creditor consent

4    by the parties that are affected by the substantive

5    consolidation of the fund debtors together to that

6    substantive consolidation.

7          So, Your Honor, the consent here and the fact that

8    we don't have a rejecting effected class that's going to be

9    adversely impacted by substantive consolidation moves this

10   case out of the New Century model which Mr. Sarachek cited in

11   his opposition.  New Century as I'm sure the court recalls --

12          THE COURT:  Vividly.

13          MR. HOLT:  -- there was an objecting class of

14   creditors effected by substantive consolidation that had

15   rejected the plan.  These aren't the facts before the court

16   today.  The facts before the court today put this case in, I

17   think, the much more instructive precedent of the court's

18   recent opinion in Abisena (phonetic), and I may be

19   pronouncing this wrong, Holding in which, again, substantive

20   consolidation was proposed under the plan, the creditors

21   overwhelmingly voted to accept the plan and there were a few

22   dissident holders who were bound by the consent of the

23   accepting classes.

24          Your Honor, separate and apart from creditor

25   consent the facts here support consolidation of the other

1  debtors into Woodbridge Group of Companies under the second

2  rational in Owens Corning which is hopeless comingling of

3  assets and liabilities of the entities to be substantively

4  consolidated.  Mr. Sharp said that in his declaration at

5  Paragraphs 11 through 19.  He reiterated and reaffirmed that

6  testimony and I think made it even stronger here in court

7  today, Your Honor.

8         So, even if we didn't have creditor consent, which

9  we do, consolidation of those entities is appropriate under

10 the second prong of Owens Corning.  The Kapila declaration

11 further supports this conclusion when it similarly testifies

12 about comingling of assets and liabilities as among

13 Woodbridge Group of Companies and the entities that actually

14 own the properties, Your Honor.

15         We followed the plan settlements motion in early

16 October out of an abundance of caution seeking, among other

17 things, to substantively consolidate Woodbridge Group of

18 Companies and all the other debtors based on satisfaction of

19 the second Owens Corning rationale.  To the extent the court

20 has any concern about substantively consolidating those

21 entities together under the plan the court could do so

22 independent from the plan pursuant to the plan settlements

23 motion.

24         Regardless, Your Honor, we've got a belt, and we

25 have suspenders and we have a piece of chewing gum as well to

1   hold the pants up.  There are three different ways to get to

2   substantive consolidation here, Your Honor; all of which are

3   completely appropriate.  So, Your Honor, we'd again submit

4   that that aspect of the Sarachek objection should be

5   overruled.

6          The fourth point that Mr. Sarachek raises is he

7   complains that the plan's "avoiding" what he calls valid

8   intercompany liens.  Your Honor, both of those words, the

9   verb and the adjective, are both incorrect.  There is no

10  avoiding of anything under the plan.  There's an elimination

11  of asserted intercompany claims as part of a comprehensive

12  settlement under the plan.  Nothing is being avoided.  There

13  is not an avoidance judgement.  We're not seeking a judgment

14  entered in any of the avoidance powers under the plan;

15  instead, there's a settlement and compromise that resolves

16  intercompany claims and liabilities.

17         Second, I think almost everyone else in the

18  courtroom would stand-up and disagree with the label of those

19  intercompany liens and claims as valid.  As Mr. Sharp

20  testified in court, earlier today, these were fictitious

21  intercompany amounts that had no bearing to what was actually

22  loaned between the fund debtors and the PropCo debtors.  In

23  most cases there were no monies advanced from the fund

24  debtors to the PropCo debtors.  They went through the

25  comingled pipeline that Mr. Sharp described.  They had

1 | virtually no bearing to what the purchase price of the

2 | property was either, Your Honor.

3 | There is a pending adversary proceeding that the

4 | creditors committee sought and obtained standing to pursue

5 | and file.  That adversary proceeding is on file.  It attacks

6 | these intercompany liens and claims on a number of different

7 | fronts, Your Honor, including that there are actual

8 | fraudulent transfers, constructive fraudulent transfers and

9 | simply invalid as a matter of non-bankruptcy law because

10 | there was an adequate consideration provided to support the

11 | purported intercompany loans and liens, Your Honor.

12 | These could be appropriately settled under the

13 | plan and the creditors committee's adversary proceeding can

14 | be resolved under the plan for all of the reasons Your Honor

15 | discussed in the Exide published decision that you wrote back

16 | in, I think, 2003; 15 years ago, at this point.

17 | THE COURT:  It seems like yesterday.

18 | (Laughter)

19 | MR. HOLT:  Plants every day around the country

20 | settle intercompany claims, and liens in multi-debtor

21 | estates.  This is not something new that we're doing for the

22 | first time in this case and there is nothing inappropriate

23 | about it.

24 | Your Honor, Mr. Sarachek doesn't like the

25 | settlement, but it's well within the bounds of reasonableness

1  for all the reasons set forth in the plan settlements motion

2  and, again, in the adversary complaint that the committee's

3  filed.  Here, Your Honor, I think this is an area where the

4  fundamental black letter principal that dissenting creditors

5  within an accepting class are bound by what the class does.

6  The classes, all classes of creditors, particularly the

7  noteholders in Class 3 who are affected by this settlement

8  and voted overwhelmingly to accept it.

9       So, although Mr. Sarachek doesn't think it's a

10  fair settlement the class in which his clients are situated

11  have disagreed vehemently.  Your Honor, I think that class

12  acceptance of the settlement and its overall reasonableness

13  provides a sufficient basis for the court to approve it.

14       The fifth argument that Mr. Sarachek raises is the

15  Section 1129(a)(10) issues.  Mr. Sarachek points to this

16  court's decision Tribune.  Makes the, I think, easy argument

17  that, well, we have 306 debtors here, Your Honor, so the

18  debtors have to have an impaired consenting class at each

19  one.

20       This argument doesn't work, Your Honor, for at

21  least two reasons.  First, at the fund debtors where Mr.

22  Sarachek's clients actually have claims this is not even a

23  theoretical issue.  The voting report shows that at every

24  fund debtor there is either an impaired accepting class of

25  notes or an impaired accepting class of units or both.  So,

1   on an entity by entity basis, Your Honor, every fund debtor

2   that has creditors has an impaired accepting class.

3           Your Honor, we noted in a footnote in the brief

4   that there is a seventh fund debtor that's not shown on the

5   tabulation report as having any creditors voting in favor of

6   the plan because there are no creditors at that fund entity.

7   So, although it's a debtor that exists as reflected in the

8   schedules that were filed for that entity there aren't any

9   creditors who needed to be solicited and there were no

10  ballots returned at that entity for or against the plan

11  because there were no creditors to solicit votes on.

12          So, that does not have an impaired accepting class

13  because it doesn't have a class of creditors that's impaired

14  under the plan.  And because it doesn't have a class of

15  creditors that's impaired under the plan, if we're doing a

16  debtor by debtor analysis and looking at 1129(a)(10) on an

17  entity by entity basis 1129(a)(10) does not need to be

18  satisfied as to that entity, Your Honor, because the plan

19  with respect to that entity does not include an impaired

20  class of creditors as to that entity.

21          Second, Your Honor, Tribune makes clear repeatedly

22  that it was not a case involving substantive consolidation.

23  Your Honor articulated a legal principal that expressly

24  applied, "absent substantive consolidation."  Well, here,

25  Your Honor, we have substantive consolidation.  We have it

1  proposed under the plan as to the fund debtors, as to

2  Woodbridge of Companies and the other debtors.  We also have

3  it proposed independently of the plan in the plan

4  settlement's motion, Your Honor.

5         So, within the teachings of Tribune we're outside

6  of that problem that Section 1129(a)(10) creates.  So, moving

7  down from the fund debtors to the other debtors, Your Honor,

8  every other debtor that had a creditor vote on the plan had a

9  class that accepted.  There was unanimous consent at

10  Woodbridge Group of Companies and every other debtor where

11  someone voted.

12         There are, Your Honor, unlike at the fund level,

13  debtor entities that have creditors where no one at that

14  debtor returned a ballot one way or the other.  So, there is

15  not a rejecting class and there's not an accepting class.

16  Your Honor, we'd submit that to the extent that's an issue at

17  all it's resolved by the substantive consolidation proposed

18  under the plan which on its face differentiates this case

19  from Tribune.

20         We'd also submit, Your Honor, that if Your Honor

21  is in any way uncomfortable about getting there in that

22  fashion the plan settlement's motion proposes to

23  substantively consolidate all of those entities independent

24  from the plan.  Once that substantive consolidation is done,

25  Your Honor, there's one entity, consolidated Woodbridge of

1   Companies, that has one class of creditors, Class 4, and that

2   one class of creditors is the impaired class that is not only

3   consenting, but voted 100 percent to accept the plan, Your

4   Honor.  So, that satisfies Section 1129(a)(10).

5         Either way, Your Honor, either through substantive

6   consolidation under the plan or independently through the

7   plan settlements motion this issue goes away as to those

8   entities.  So, there is no 1129(a)(10) problem here, Your

9   Honor.  It's satisfied by the fund entities without

10  substantive consolidation and substantive consolidation,

11  under either road, satisfies as it to the other entities.

12        Finally, Your Honor, Mr. Sarachek complains that

13  unitholders should be receiving full *pari passu* treatment

14  with noteholders if the court's finding a Ponzi scheme or

15  substantively consolidating entities.  Your Honor, this

16  argument just ignores the plan's comprehensive settlement of

17  the noteholder/unitholder dispute which is intended to

18  resolve this and which is eminently reasonable.

19        First, Your Honor, there are certainly arguments

20  that the units are debt like the notes, but there are many

21  arguments to the contrary.  This is a complex fact intensive

22  issue with colorable points to be made on both sides as we

23  detailed at length in the plan settlements motion.  In fact,

24  during plan negotiations Mr. Sabin made exactly the argument

25  that Mr. Sarachek articulated which is this is a Ponzi

1  scheme.  In Ponzi schemes everyone was defrauded so everyone

2  should be treated equally.

3           There were responses to that argument including,

4  first, the fact that there's no case that actually says

5  that's the principal that applies for Section 1129 or 1123

6  purposes in the context of plan confirmation.  There is

7  certainly no opinion from the Supreme Court of the United

8  States, or the Third Circuit Court of Appeals or any court in

9  Delaware that establishes that principal, but it's an

10 argument one could make.

11          There are also arguments people could make based

12 on the terms of the documents here, Your Honor, that the

13 units repeatedly, there is an example included with Mr.

14 Sharp's declaration, reference the units as an equity

15 investment with upside returns and things with no equity.

16 There are arguments people could make that there is no

17 bankruptcy code version two with special rules for Ponzi

18 schemes.  The bankruptcy code, as congress wrote it, doesn't

19 even use the word Ponzi scheme, Your Honor.

20          So, if something is debt or equity the same

21 principles that would apply outside the Ponzi scheme context

22 apply equally within the Ponzi scheme context.  We don't have

23 different rules and the statutory text doesn't give different

24 principals that apply only in Ponzi scheme cases, Your Honor.

25          So, this was something all of the parties took

1 | into account.  The parties considered this.  They considered
2 | all of the competing arguments that all of the very able
3 | counsel in the room was able to come up with on each side of
4 | this, Your Honor.  And there was a negotiated compromise that
5 | afforded the unitholders treatment as if they had claims at a
6 | 72.5 percent ratio relative to noteholders, Your Honor.
7 |          I think it's clear, based on the uncertainty, that
8 | some level of discount is appropriate here, Your Honor.
9 | There has to be some discount because there are arguments
10 | that could be made both ways, Your Honor.  Whenever arguments
11 | could be made both ways pure *pari passu* or 100 percent
12 | treatment is not a settlement; it's a victory.  It's a
13 | victory that would only be obtained through a hard-fought
14 | litigation, Your Honor.
15 |          So, we'd submit, for the reasons detailed in the
16 | plan settlements motion, that 72.5 percent is a reasonable
17 | point that could be reached within the realm of acceptable
18 | outcomes.  It was something that was negotiated among
19 | stakeholders who had every reason to be fighting on both
20 | sides of this, Your Honor.
21 |          So, Mr. Sarachek doesn't provide any reason why
22 | that's wrong other than making one of the many, many
23 | different arguments that could be made on both sides of this
24 | complicated issue.
25 |          THE COURT:  Well, Mr. Sabin made it too you said.

1        MR. HOLT:  That's true.

2        THE COURT:  I can't imagine --

3        MR. HOLT:  Along with some other arguments.  He

4 had many more.

5     (Laughter)

6        MR. HOLT:  These were all fully taken into

7 account.

8        THE COURT:  Bankruptcy sometimes does -- well,

9 creates situations with strange bed-fellows and those would

10 be two of them.

11     (Laughter)

12        MR. HOLT:  I think that's fair.  I think they both

13 probably would agree with that, Your Honor.

14        Second and even more importantly, Your Honor, is

15 the fact that the settlement's been overwhelmingly accepted

16 by the people who are affected by it.  The class of

17 unitholders voted to accept the plan by more than 97 percent

18 number and nearly 97 percent in amount.  So, the people who

19 have every incentive, economic incentive, to fight this if

20 they think it's worth fighting have overwhelmingly said we

21 don't want to fight this.  In fact, we think 72.5 percent is

22 a great number and we're happy to accept it.

23        This comes full circle to where I began, Your

24 Honor, which is when you have minority holders in a class

25 that's voted overwhelmingly to accept the plan they're bound

1   by what the class decides unless they can show that two of

2   the foundational protections for minority stakeholders have

3   been violated.  Either there is unequal treatment among the

4   unitholder class, which there is not, or the unitholders

5   would do better in a Chapter 7 case which they won't, Your

6   Honor.

7          So, once those two bedrock aspects of the entire

8   process of the statutory architecture have been satisfied

9   we're left with the class votes and it binds the minority to

10  the settlement.  That is precisely what happened in this

11  case, Your Honor.

12         So, in sum, Your Honor, the debtors are very

13  pleased to present the plan before the court.  It's the end

14  product of a lot of work that achieves a negotiated outcome

15  that's fully consistent with the code.  It's been

16  overwhelmingly accepted by the classes which we think negates

17  almost every issue that Mr. Sarachek has raised.

18         To the extent the issues are evidentiary issues we

19  think the testimony that the court has before it in the

20  declarations and heard live today amply satisfies the

21  debtors' burden on these issues, Your Honor.  We'd ask that

22  the court confirm the plan.

23         So, I'm happy to answer any questions the court

24  has.

25         THE COURT:  No.  Thank you very much.

1          MR. HOLT:  Thank you, Your Honor.

2          THE COURT:  I'll hear from the unsecured creditors

3  committee if they wish to be heard.

4          MR. PACHULSKI:  Was that a rhetorical question.

5      (Laughter)

6          MR. PACHULSKI:  Judge Carey knew exactly what to

7  ask.

8      (Laughter)

9          MR. PACHULSKI:  Your Honor, again, Richard

10  Pachulski of Pachulski Stang Ziehl & Jones on behalf of the

11  unsecured creditors committee.

12          Your Honor, I think we're two of a small group

13  that were here from the beginning of this case and I want to

14  explain how the committee got to where it did which I

15  personally am very proud of.

16          As Your Honor knows, right about the time of the

17  trustee hearing or just before that we were dealing with

18  whether the District Court was going to take this away in

19  Florida, which the unsecured creditors committee was

20  vehemently opposed to and ultimately had a trustee fight that

21  we hoped that the SEC would support, which they did.

22          In that success we came to January 23rd of this

23  year and this is what we achieved.  The professionals were

24  all gone for the debtor, effectively, other than Young

25  Conaway, but the lead counsel were gone.  The financial

1  advisors were gone.  We had no board and we had two new

2  committees.  Not a very pretty picture at the time, but one

3  that the unsecured creditors committee felt was in the very

4  best interest of this estate.  Based on what where we sit

5  today we're proud that we ended up in that position.

6          We had a committee, along with the debtor and the

7  other two ad hoc committees, that felt very strongly that

8  because of the 10,000 or so investors that we had to do this

9  quickly.  So, we had to deal with two very, very specific

10 general issues.  One, get a deal done; and as stated by

11 counsel, Mr. Sabin had very strong views as to what should

12 happen with the unitholders just as Mr. Kortanek had with the

13 noteholders and we did with the unsecured creditors

14 committee, but that would only get us to the stage of a deal.

15 That doesn't mean we'll get to confirmation.

16          So, the committee wanted to feel very comfortable

17 that we would end up coming to confirmation with a deal

18 because we could make it and not meet the requirements that

19 counsel has just gone through for the debtor.  So, where we

20 wanted to be particularly comfortable was on the Ponzi scheme

21 issue, which we've heard a lot about today, the substantive

22 consolidation issue and the intercompany issues because while

23 we can talk about some of the other issues that have been

24 raised by Mr. Sarachek, if we couldn't get comfortable with

25 that then we were going to have to go in a different

1    direction.  We may to do a plan that related to over 300

2    debtors.  We didn't think that was in the best interest, but

3    we were going to do what was mandated by the bankruptcy code.

4            So, aside from meeting on March 8th and,

5    effectively, having moot court competition between Mr. Sabin,

6    myself, Mr. Tuchin and Mr. Kortanek we then had to have two

7    days of meetings with all of the committee's business people.

8    During that time Mr. Sharp and Mr. Chin presented their

9    analysis which, frankly, was done in 60-days.  As Mr. Tuchin

10   said, they were absolutely drinking from a fire hose. The

11   unsecured creditors committee was vehement about getting it

12   done.

13           We were getting some pushback from the debtors

14   saying this is fundamentally unfair, we just showed up, it's

15   now beginning of February, mid-February and he wanted a deal

16   by March 23rd.  That, frankly, was not just mandated by the

17   committee in general, but the *de facto* chairman of the

18   committee, which I'll get to in a moment, Mr. Myrick

19   (phonetic), was insistent that we make that deal, that we get

20   something done and we make sure that we can confirm a plan.

21           So, we met and Mr. Sharp went through his Ponzi

22   scheme analysis or, more significantly, the economics.  And

23   what did he explain; that $425 million dollars had been

24   raised for investors that just went to pay other investors.

25   The clearest indicia of a Ponzi scheme that 80 million went

1  out to brokers, that approximately 30 million went out to the

2  benefit of Mr. Shapiro, and his family and his related

3  entities.  He didn't rely on the Kapila report to come to

4  that or Ms. Davis's testimony that took place during the

5  trustee hearing.  DSI had done their own analysis and came to

6  that conclusion.

7         There was no doubt in our mind that for purposes

8  of a settlement that a Ponzi scheme had occurred in this

9  case.  Now, that doesn't mean that there weren't assets.

10 I've been involved in many Ponzi scheme cases where there are

11 assets; that's the whole point.  If you can't demonstrate any

12 assets odds are pretty low that you're going to get money

13 from investors, but if you can show people the Owlwood

14 estate, which is one of the premier estates in the world,

15 you'll get more money even though your money may not have

16 gone into Owlwood and you were told it would in some

17 respects.  In that case it was a loan, it was not intended to

18 be a purchase.  So, we felt comfortable in the Ponzi scheme

19 issue.

20        Then we got to the substantive consolidation

21 issue.  In the substantive consolidation issue Mr. Sharp,

22 again, giving a presentation just as he did in his

23 declaration, stated that money, effectively, all got

24 comingled in a single account.  He states that in Paragraph

25 13 of his declaration and that that money went where it was

1    needed as Mr. Shapiro saw fit.  It could go to buy wine, it

2    could go to invest in property, it could go to pay investors

3    if the money hadn't somehow gone out from the fund, but it

4    all went into a single fund and if that weren't enough, as he

5    states in Paragraph 17 of his declaration, the books and

6    records were in shambles and there was no documentation of

7    any of the transactions.  You could never unscramble the

8    eggs.

9            So, we made the determination that when it came to

10   the consolidation issue, the substantive consolidation issue,

11   that there was no doubt in our mind -- and I assure, Your

12   Honor, this was discussed in incredible detail at the March

13   8th meeting that we knew we had to deal with Owens Corning.

14   So, when we showed up on March 22nd and 23rd we wanted to

15   make absolutely sure that if we were going to make a deal

16   that we were going to be comfortable with the substantive

17   consolidation issue.

18           Because of Mr. Sharp's presentation during those

19   two days it also became clear that the purported liens

20   between the funds and the Propco's and MezCo's were

21   fraudulent conveyances; that not to get at Mr. Sarachek's

22   clients or to other purported secured creditors, but they

23   were absolute constructive and actual fraudulent conveyances

24   which is why we brought the complaint.  So, it doesn't matter

25   at the end of the day whether Mr. Sarachek wins his appeal or

1  not.  He will not win.  I give the odds exactly what counsel

2  for the debtor gave which is about zero, but even if he wins

3  he can't get around the fact that these were absolute actual

4  and/or constructive fraudulent conveyances.  So, it was on

5  those bases that we made the deal.  That we were comfortable,

6  but not just the deal was made, but that a deal could be

7  confirmed.

8          The most important thing that we see here today,

9  Your Honor, and I think that counsel has also stated it, it's

10 not just what has been proven, but because the burden of

11 proof has been met at some point Mr. Sarachek has to present

12 some evidence counter and there's nothing counter; nothing on

13 the Ponzi scheme, nothing on substantive consolidation,

14 nothing on the settlement.  And you would think that there

15 would have been, at least, a deposition, there would have

16 been some discovery to try to refute it, but there is none.

17 The fact is he could have done all that and we would have

18 ended up exactly where we are today confirming a plan that

19 deals with those specific issues.

20         Here is the last part, Your Honor, this is the

21 best possible plan after the time that has gone in this case

22 with people working extremely hard.  This is the best we can

23 do.  It is not just the best we can do, it is actually an

24 excellent plan in light of the fact that we believe, and

25 we'll see how it turns out, that noteholders in a Ponzi

1  scheme, unsecured creditors in a Ponzi scheme may receive 70

2  cents on the dollar.  Some cases may be better, but we're

3  going to have to hear homerun on some litigation, for

4  instance.

5        Mr. Sharp and I were involved in a case, another

6  large Ponzi scheme, at the end of the day I think it was in

7  the neighborhood of five to ten cents.  So, what's unusual?

8  What's the alternative; the alternative is that the plan

9  won't be confirmed, we will spend tens and tens of millions

10  of dollars.  People who have already been harmed will be

11  greatly harmed in the future as compared to liquidating these

12  assets and paying people as soon as possible.

13        On a final note, Your Honor, and this is

14  particularly important to me, this case -- all cases I take

15  personally.  This case I take more personally because not

16  just the 10,000 investors, Your Honor, but we had a committee

17  member, Mr. Myrick, who made this, who drove this deal on

18  March 23rd who died four days later.  Whether he knew it or

19  not, because it was a heart attack, he was instrumental in

20  this deal being made.  And at the end of the day this plan

21  should be confirmed because of people like him and the other

22  10,000 investors as compared to fighting and at the end of

23  the day doing much worse.

24        Now, I would like to answer your question, Your

25  Honor, on the liquidity facility which is at the end of the

1    day with all the work that was done by lots of people.  This

2    was a very complicated facility because, effectively, you

3    needed to be licenses in 50 states.  The parties who had

4    agreed to do the transaction were not comfortable, among

5    other things, with all of the licensing requirements.

6              So, at the end of the day the SEC, among other

7    things and unrelated to the liquidity facility, wanted this

8    entity, the ultimate entities to be able to be traded and if

9    people want they'll be able to trade-out.  We think we will

10   do well and we hope that people don't sell at a discount, but

11   there will now be a mechanism post-confirmation after the

12   entities are formed that if people want to trade out of their

13   positions they can.

14             So, we're disappointed the liquidity facility

15   didn't work, but to be honest, Your Honor, it was pulled at

16   the last minute.  We were surprised, but there were a lot of

17   things that happened in this case that we were surprised

18   about.  So, with that, Your Honor, the official creditors

19   committee it is in deep support of this plan and we would ask

20   that Your Honor confirm it.

21             We thank you for everything you have done to get

22   us in this position today.

23             THE COURT:  Thank you.

24             I'll hear from the ad hoc committees.

25             MR. KORTANEK:  Thank you, Your Honor; Steve

1  Kortanek of Drinker Biddle for the ad hoc noteholder group.

2          Your Honor, this is late in the day, but I did

3  want to introduce Mr. Jay Bainan (ph) who's in court today.

4  He's the co-chair of the noteholder group and is in court for

5  confirmation.  Mr. Bainan will be the noteholder group's

6  designee on the supervisory board post-effective date.

7          The noteholder group fully and emphatically

8  supports confirmation of the plan today, Your Honor, and we

9  echo the comments made by Mr. Pachulski, and Mr. Tuchin and

10 as well as, I suspect, what Mr. Sabin will say.  The plan is

11 the product of an immense amount of work by the debtors, each

12 of the three committees, all of their professionals and in

13 particular, as Mr. Pachulski noted, our clients, members of

14 the three committees and members of the debtors' board and

15 management have worked exceptionally hard to get us here

16 today.

17         Like Mr. Pachulski's comments, the noteholder

18 group firmly believes that this plan represents the best

19 possible outcome under these difficult circumstances for

20 investor victims generally and especially noteholder victims.

21         This global settlement or the global settlement at

22 the core of this plan is truly an outstanding accomplishment

23 given the issues that were presented by the parties,

24 negotiated in a very short timeframe and, indeed, as Mr.

25 Tuchin pointed out, involving several major issues as to

1  which there simply was not binding precedent.  So, we echo

2  the view that if these issues weren't settled we would,

3  indeed, have faced many months, perhaps years of litigation

4  and appeals; all of which would have delayed and deluded

5  victim recoveries in these cases.  It was just unacceptable

6  as a proposition.

7          So, if the plan is not confirmed today,

8  unfortunately, that's the prospect that might very well face

9  investor victims.  We also fully agree with Mr. Tuchin's

10  remarks in terms of the amount of creditor engagement in this

11  process specifically having three committees representing

12  different constituencies in the cases.

13          This was an unusual situation, as Your Honor may

14  recall, where we raised, we started off as our firm had

15  represented an unofficial ad hoc group.  Serious

16  representation issues early in the cases about the same time

17  as the trustee motion was being litigated and we're very

18  grateful that our motion to seek appointment of an official

19  noteholder representative body was settled.  As part of that

20  trustee motion settlement created the official noteholder

21  committee or noteholder group as well as Mr. Sabin's client

22  the unitholder group.

23          That set the stage for a good process and good

24  processes get good outcomes.  That is, we think, a major

25  reason why the March settlement process and term sheet was

1   able to happen on such a short basis.  We resolved the

2   specific constituency representation issues.  That allowed

3   proper engagement, proper advocacy of a great many issue.

4   Noteholders uniformly came to this case when they first

5   learned of the Ponzi fraud and the filing of the bankruptcy

6   case with a great many concerns and issues.

7           Really, I think, at the top of the list for all

8   noteholders was I was promised liens, what about my liens.

9   So, addressing those issues, and those beliefs and what most

10  of the loan documents say in a verifiable, and with a good

11  process and with good fiduciary representing it which has

12  been what our client's main mission has been was essential, I

13  think, to get us to the point where we had this immense

14  acceptance rate among noteholders.

15          So, we start from all these individual victims

16  believing I had liens, I should be able to fall on my real

17  estate, and follow those proceeds through.  We did our best

18  while the settlement was, you know, in process to maintain

19  adequate protection of those lien assertions, I'll call them,

20  throughout the cases.  So, we did those things to protect

21  noteholders claims as best we could under the circumstances,

22  but we believe and our clients strongly believe that

23  noteholders should feel very confident.

24          The settlement here reflects the best arguments

25  that we could put forward on those lien issues.  We have

1  many, many theories to deal with those more so then have been

2  raised in the current plan objection and we think all those

3  issues have been fully and fairly resolved in economic terms

4  and what the plan settlement embodies.

5         Your Honor, I think that with those comments we,

6  again, reiterate our support for confirmation of the plan.

7  We think it's a phenomenal outcome and confirmation will

8  allow distributions to begin by year-end which will be very

9  important.  Noteholders had, as with unitholders, many of

10  them had relied on getting interest payments on a regular

11  basis.  So, the urgency of distributions to creditors is

12  extremely high and it's been something that all of the estate

13  parties have committed to.

14         Thank you, Your Honor.  That's all we have.

15         THE COURT:  Thank you.

16         I'll hear from the unitholders.

17         MR. SABIN:  Good morning, Your Honor; Jeff Sabin

18  for the ad hoc group of unitholders.

19         First and foremost, in the courtroom I'd like to

20  introduce again, I know you've met him at least once, but I'm

21  going to introduce the two members of our committee; Dr.

22  Raymond Blackburn who will also be our representative on the

23  supervisory board if this case is confirmed and goes

24  effective, and next to him Dr. Chris Pinney.

25         Your Honor, pardon me for a reference to what was

1  a jingle at one time for a cigarette, but we've come a long

2  way, baby, if you have and in a short period of time.  And

3  maybe more aptly, if one goes to the movies these days and

4  remembers a particular landing on the moon, I view March as

5  one giant step and I view today, hopefully, as the great

6  leap.

7           First and foremost, I join in the debtors'

8  memorandum of law supporting confirmation and seeking

9  confirmation, and in the oral presentation so ably done by

10  Mr. Holt.  I join in the comments of Mr. Pachulski and, yes,

11  in all of them, and in the comments of my colleague Mr.

12  Kortanek.

13           The work that was done February and March was

14  extraordinary.  Not only was it a sharing of diligence in a

15  very short period of time, thank you to Mr. Sharp, and Mr.

16  Chin and their teams, but in addition it was extraordinary

17  lawyering both from position papers, to responses, to

18  position papers, to mediation sessions and then even after we

19  got to deal with the issues of treatment and subcon the most

20  important thing which is keeping in all of our, front of our

21  brains if you will, the need for speed.  By that I mean

22  recognizing that the investors who are hurt here many of them

23  are retirees, many of them had spent their last dollar being

24  defrauded by this Ponzi scheme and many of them were in need

25  of some immediate cash.

1          I think what we've come up with, independent of

2    the treatment, and the subcon, and the settlement themselves

3    inside the plan, is a structure, as Mr. Pachulski referred

4    to, that says if they're still in need and didn't avail

5    themselves of the facility that never came about we soon hope

6    that post-effective date, assuming confirmation, that the A-

7    certificates will be tradeable and we hope they're not

8    tradeable at a deep discount, but they will be tradeable.

9    I'm sure people will be looking at a significant asset base

10   that will be in the hands of a wind-down entity.

11          Now, Mr. Sarachek is here and has availed himself

12   at the eleventh hour of trying to, otherwise, upset and

13   challenge various provisions.  I submit that he's had his day

14   in court for quite a while and has not availed himself of all

15   the other things that he could have done to stop this train

16   that, otherwise, is a proper train that investors got on,

17   that committees got on, that the debtors got on.  That train

18   has voted and that train has said, look, you had your day in

19   court, it was an opinion issue.  You have appealed, you never

20   asked for a stay.  Number two, you, otherwise, never

21   challenged classification.

22          So, let's remember of these 306 some odd debtors

23   that there really are two classifications.  One is the seven

24   fund debtors.  And you have heard that term referred to.

25   Those are the debtors that, otherwise, solicited or, at

1  least, arguably solicited the funds from investors.  Six of

2  them are the ones who, otherwise, received those funds and

3  immediately comingled it.  You have heard the testimony and

4  you've read the declaration of Mr. Sharp and of Mr. Kapila.

5  Those are the ones, okay, that are fund debtors; that's all

6  they have other than their intercompany claims and/or

7  intercompany liens against property owning debtors or Mezco

8  debtors.  Mezco debtors I refer to as the ones who own the

9  equity in the PropCo debtors.

10        The claims that were filed and the objection that

11  was filed treats Mr. Sarachek's clients and the plan itself

12  only as creditors of the fund debtors, not of PropCo debtors,

13  not of Mezco debtors.  In fact, there's never been an

14  assertion anywhere in any document I've seen of a mortgage,

15  properly filed or not, against any of the properties

16  themselves.

17        So, when Mr. Pachulski says, gee, let's remember

18  in this case the Cybergenetics motion that the committee

19  brought which articulated that which was summarized by Mr.

20  Pachulski which says, look, your assertion and your client's

21  assertion read in its best light is that somehow your clients

22  have perfected lien rights in these intercompany claims and

23  intercompany liens of the fund debtors against Propco and/or

24  Mezco.  In particular, his lawsuit, the adversary proceeding

25  with respect to Owlwood, was just one aspect arguing

1  different theories to get to that conclusion.

2          You may remember that that lawsuit was brought and

3  also then pending was the committee's Cybergenetics motion

4  and that we put off for another day anything to do with that

5  motion for a while, then it was granted, and then we said,

6  well, committee if you want you can actually commence your

7  adversary, but let's stay that adversary until we get to

8  confirmation.  We, otherwise, are now here.

9          There is no need for any further delay.  There is

10 no need for that lawsuit to ever go forward because,

11 effectively, the investors have said we understand, we

12 understand what our professionals and our fiduciary groups

13 did.  We understand it and we do it in the right way which is

14 with our vote.  We understand it by percentages that are

15 north of 95 percent in each of the classes.  That vote, okay,

16 as Mr. Holt so ably argued, was not just for the plan it's

17 for the settlements in the plan.

18         So, as you heard also I'm not only in support of

19 confirmation, but in support of the form of confirmation

20 order in which you will make findings with respect to the

21 propriety of the global settlement, with respect to which you

22 will, otherwise, subsume in the confirmation order approval

23 of the separate 9019 motion for the global settlement.  Why?

24 It's pretty obvious why, because we don't need any kind of

25 further challenge if this court were to bless confirmation

1  based on equitable mootness.  The plan is based on, it's a

2  bedrock.  Okay.  That settlement is the bedrock of this plan.

3  You can't take that settlement out, okay, and unscramble the

4  egg that, otherwise, the plan scrambles, rightfully, says all

5  the voters.

6          In addition, you've heard references from Mr.

7  Sarachek to a request for some reserve.  Now, unless I've

8  missed something on the docket he has not filed a Bankruptcy

9  Rule 3020(a) motion.  So, it's inappropriate at this point to

10 even raise the request for some kind of reserve regardless of

11 whether there are funds to put in a reserve.  And you've

12 heard that the confirmation order itself and when we go

13 effective the liens, the intercompany liens, the intercompany

14 notes will be gone for his clients.

15         So, for all of those reasons, Your Honor, we

16 support and urge you to order confirmation pursuant to the

17 confirmation order and we thank you for, otherwise, herding

18 all the cats and forcing us to get together in a room and,

19 otherwise, spend days trying to get to a very difficult, very

20 arm's length negotiated settlement.  And while there's a

21 piece of me that would, otherwise, love to be arguing to the

22 Supreme Court with Mr. Pachulski on my left and Mr. Klee on

23 my right some very interesting issues that are in the

24 position papers I'll save that for another day.

25         Thank you, Your Honor.

1          THE COURT:  I'm sure the Supreme Court will be

2    grateful for that.

3        (Laughter)

4          THE COURT:  Does the U.S. Trustee wish to be

5    heard?

6          MR. FOX:  Good afternoon, Your Honor.  I'll be

7    brief.  Tim Fox on behalf of the United States Trustee.

8          May I please the court, my office does not object

9    to confirmation of the plan.  And consistent with debtors'

10   counsel's comments earlier we raise some informal comments

11   with respect to the plan vis-à-vis and the settlement motion.

12          This is an issue that comes up from time to time

13   in cases.  Here the facts are so distinct with respect to the

14   need for settlement that we are very happy to have seen the

15   separate settlement motions filed in connection with the plan

16   here.  We think it's important that the debtors satisfy the

17   burden for confirmation under the standards of the bankruptcy

18   code.  And based on all the evidence that's been placed into

19   the record we believe the debtors have satisfied that and as

20   I said before have no objection to confirmation of the plan.

21          I think it's a meaningful distinction for

22   confirmation of a plan from the settlement of a number of

23   issues and without the apparatus of the bankruptcy code and

24   the confirmation of a plan I don't think my office would feel

25   comfortable binding every party based solely on a 9019

1 settlement even among fiduciaries.  So, we believe that the

2 plan process was integral to the confirmation of the plan and

3 to effectuating the relief that the plan seeks to implement

4 for all of the victim investors as well as the general

5 unsecured creditors of the debtors' estates.

6           As I said, Your Honor, we have no objection to

7 confirmation of the plan and to the terms of the plan

8 settlement, and are happy to receive those in a dual track

9 process.

10           THE COURT:  Thank you.

11           MR. FOX:  Thank you.

12           THE COURT:  Anyone else wish to be heard before I

13 go to Mr. Sarachek?

14           MR. BADDLEY:  Good afternoon, Your Honor; David

15 Baddley from the Securities & Exchange Commission.  It's nice

16 to be back here in a positive environment such as a plan

17 confirmation hearing.

18           The SEC wholly supports the plan for all the

19 reasons that have been mentioned.  Clearly, it resolves very

20 complex and significant issues regarding priority and

21 distribution.  The result is that every investor will recover

22 something meaningful here and no one will recover nothing.

23           I also value the balance of the strong business

24 plan with the liquidity.  You know, the business plan is

25 designed to maximize the asset values by a control sale

1   process over several years.  Normally the cost of that

2   process would be a loss of liquidity while investors waited

3   for those monies to come in, but not in this case because the

4   plan does create a mechanism for the trust to be registered

5   and to provide a public market with pricing transparency for

6   the investors to sell their interest if they choose if that

7   happens.  That is a unique and creative feature of this plan

8   which I know we worked very hard with the debtors to help

9   facilitate and, hopefully, that will provide some value and

10  optionality to the investors.

11          Also, I was very pleased to see the high voter

12  participation that Mr. Tuchin pointed out as well as the

13  overwhelming support.  Also, obviously, if the plan is

14  confirmed now then there would be a significant reduction in

15  the ongoing administrative expense accrual for the estates.

16          The only comment that we did have was a clarifying

17  provision in the confirmation order which I believe has been

18  added in Paragraph 43, which makes it clear that nothing in

19  the plan's release or exculpation provisions will impair the

20  SEC's investigation or enforcement powers against any of the

21  non-debtors.

22          Since we filed the action against Woodbridge, and

23  Mr. Shapiro and others in December we have filed another

24  action against some of the external agents.  Our

25  investigation is still ongoing and our plan is to contribute

1  whatever recoveries from these and other future actions to

2  the liquidation trust so that it can supplement the

3  distributions to the investors.

4        I saw that recently the court did enter the order

5  approving the settlement between the debtors and the SEC,

6  we're grateful for that.  Thank you.

7        If the plan is confirmed then we will not be

8  filing a proof of claim.  I think our deadline right now is

9  this Friday, but if the plan is not confirmed then we would

10 need to file a proof of claim based on the judgement, not

11 necessarily to receive a distribution of assets, but

12 certainly, at least to preserve rights in order to make sure

13 that whatever the outcome may be is something that is fair to

14 the investors.

15       So, I would like to thank all the professionals.

16 I think you all took on a massive responsibility and

17 performed exceptionally.  I know the lead attorneys get a lot

18 of the shout-out, but I know you all have a lot of staff, and

19 support behind you and please pass on our appreciation for

20 everything that you all have done.  As well as to thank the

21 court.  I know you spent a lot of time early in the case to,

22 you know, give up time for the hearing as well as to provide

23 the parties with a lot of meaningful guidance.  That really

24 did get the case on a solid footing which has gotten us to a

25 confirmation hearing in roughly nine months.  We're very

1  grateful.

2          Thank you.

3          THE COURT:  So, Mr. Baddley, indulge me for a

4  moment.  The participation of the SEC here has -- it's not

5  only welcomed, it's been extremely positive.  But be honest

6  with me, you didn't really want to be here, initially, did

7  you?

8      (Laughter)

9          MR. BADDLEY:  Well, I could normally say I'm not

10  authorized to make a position on this, but if this is me

11  speaking, you know, I do have a bankruptcy background.  And I

12  do think that there is a value to this process and especially

13  in a case like this.  And I don't have a crystal ball to say

14  what would have happened in a receivership or not.

15          But I cannot imagine a result that would have been

16  any better than this in the time that it happened.  Because,

17  as I said early when there was pending committee motions,

18  these constituents did need representation and they got it

19  and I think that's why we're here.  So, we're very pleased

20  with the outcome of the case.

21          THE COURT:  Well thank you for your participation.

22      (Laughter)

23          THE COURT:  Would anyone else like to be heard?

24          Mr. Sarachek, you're up.

25          MR. SARACHEK:  Not easy to follow all this

1   kumbaya.

2           Your Honor, and I'll be brief, what drives me is

3   Lisa de le Rochelle, an 85-year old lawyer who invested in

4   Owlwood.  What drives me is Betty Lou who invested in

5   Owlwood, a California resident.  What drives me is Jan

6   Castaneda, a lawyer from California who did an enormous

7   amount of due diligence here and, obviously, was defrauded.

8   Is it a Ponzi scheme?  I don't know.

9           But that's what drives me, Judge.  That those

10  parties all -- they are fairly sophisticated parties who did

11  due diligence here prior to entering into this investment and

12  do believe they're secured.

13          A lot has been made of the fact that, oh, he

14  didn't do discovery, this, that the other thing.  Well, along

15  the way since February, we've taken all the appropriate steps

16  with respect to each property sale to reserve our rights with

17  respect to the proceeds as provided by the Bankruptcy Code.

18  And we filed various objections, most of them, obviously,

19  (indiscernible) obviously, have been denied.

20          But the issue, the one issue that I'm having

21  trouble with is the Gulfco case.  And that case basically

22  says that you can't extinguish existing liens between various

23  entities through a plan.  And it requires an adversary

24  proceeding.  Now, we started one adversary proceeding, but

25  there are many.  If there any valid liens here which,

1  obviously, you know, I believe there are, they can't do what

2  they're doing in their plan.

3        It's nice that they want to do it.  But I don't

4  think that under the Gulfco case, they can do it.  And the

5  Gulfco case is a case that's not just cited in the bankruptcy

6  world.  In virtually every corporate borrowing opinion letter

7  from, you know, law firms, from Sullivan to Kirbath (ph) to

8  whoever.  I see that case cited over and over again.  And I

9  don't know how that gets reconciled here.  I don't.  I don't

10 have an answer for you.  I don't think it's the way the

11 debtor is proposing to do it.

12       Thank you, Judge, for your time.  I'll let our

13 papers stand for themselves.  Thank you.

14       THE COURT:  Thank you.

15       All right, under the circumstances this is a

16 decision when I render it either has to be by a very detailed

17 bench decision or by writing, so I'm not going to decide from

18 the bench today.  But I will promise, which I long ago

19 stopped doing because it never worked in my favor, but I will

20 promise a decision within days, not weeks.

21       But as long as you're here, I think what I'd like

22 you to do is to walk me through the proposed confirmation

23 order just to flush out to see whether either the court or

24 others have any issues with where it now stands.

25       MR. TUCHIN:  Thank you, Your Honor.  And there was

1    one change made to the form of order that was submitted last

2    week.  Actually, ministerial changes.  We added in some

3    docket numbers and then one other change at the request of

4    the SEC.

5              We had indicated that the Ponzi scheme was

6    discovered in December 2017 and the SEC requested that we

7    change that to say the Ponzi scheme was discovered no later

8    than December 2017.  Certainly, an acceptable change to us.

9              THE COURT:  All right.

10             MR. TUCHIN:  May I approach with that redline and

11   the form of order?

12             THE COURT:  Yes, you may.

13             MR. TUCHIN:   Thank you.

14             THE COURT:  All right, well I see the changes that

15   have been made.  Let me ask for the record, does anyone have

16   any comments with respect to any of the provisions of the

17   proposed order?

18        (No verbal response)

19             THE COURT:  I hear no response.

20             Is there anything else that we need to talk about

21   today?

22             MR. TUCHIN:  May I just have one minute, Your

23   Honor?

24             THE COURT:  Yes, you may.  Yes, it would be a good

25   idea to give the SEC a little extension on their time.

1          MR. TUCHIN:  Exactly.  So, Your Honor, we have

2   agreed that we will extend the SEC's bar date until two

3   business days following the court's ruling on confirmation.

4          THE COURT:  Very well.

5          Anything else we need to talk about?

6          MR. TUCHIN:  No, thank you, Your Honor.

7          THE COURT:  All right, thank you, all, very much.

8   I appreciate all of the submissions and arguments and

9   presentations made.  That concludes this hearing.  Court will

10  stand in recess.

11          MR. TUCHIN:  Thank you, Your Honor.

12          MR. SARACHEK:  Thank you, Your Honor.

13      (Proceedings conclude at 12:18 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                         <u>CERTIFICATE</u>

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     <u>/s/Mary Zajaczkowski</u>                    October 24, 2018
7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25